UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ANDREW MICHAEL SANTILLANES,

    Petitioner,

vs.              CIV. No. 97-549 LH/DJS

TIM LeMASTER,

      Respondent.

## MAGISTRATE JUDGE'S FINDINGS
## AND RECOMMENDED DISPOSITION[1]

 1. This is a proceeding on a petition for writ of habeas corpus pursuant to 28 U.S.C. §

2254, filed April 21, 1997.  Petitioner Andrew Santillanes ("Santillanes") challenges the judgment

and sentence entered by the Second Judicial District Court in State v. Santillanes, Cr. No. 39227

(County of Bernalillo, New Mexico).  Santillanes pled not guilty and was tried by a jury.  He was

convicted on July 11, 1985 of first degree murder and two counts of attempted armed robbery.  A

Judgment and Sentence was entered on July 25, 1985.

 2. The New Mexico Supreme Court affirmed Santillanes' conviction in 1986, and,

thereafter, he filed three state habeas petitions, in 1994, 1995, and 1997, asserting a variety of

grounds for relief.  All of these petitions were denied.  Following denial of his third habeas

---

[1] Within ten (10) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations.  A party must file any objections with the Clerk of the U.S. District Court within the ten-day period allowed if that party wants to have appellate review of the findings and recommendations.  If no objections are filed, no appellate review will be allowed.

petition, Santillanes attempted to file a petition for writ of certiorari with the state supreme court, but it was returned to him by the court clerk as untimely. He thereafter filed this habeas petition in federal court.

3. Santillanes presents the following grounds for federal habeas review:

<u>Ground One</u>: The prosecution failed to disclose exculpatory evidence consisting of the identities of informants who allegedly told the police that the crime was committed by another person;

<u>Ground Two</u>: He was denied effective assistance of counsel in that his attorney advised him not to testify in his own behalf and failed to use polygraph evidence at trial.

## **Procedural Default**

4. This petition was originally referred to Magistrate Judge Don J. Svet. Judge Svet recused himself on June 22, 1999 on the motion of Petitioner, after realizing and informing the parties that he had extrajudicial knowledge of an unrelated federal rape charge against Santillanes. Early on in these proceedings, before he recused himself, Judge Svet recommended dismissal of the petition on grounds of procedural default, based on Santillanes' failure to file a timely petition for writ of certiorari with the New Mexico Supreme Court following denial of his third state petition for habeas corpus.

5. Respondent did not rely on procedural default in his Answer; however, Judge Svet appropriately raised the issue *sua sponte.* <u>Hardiman v. Reynolds</u>, 971 F. 2d 500 (10th Cir. 1992) (state procedural default may be raised *sua sponte*, as long as the court provides the petitioner an opportunity to respond). Upon receiving Santillanes' objections raising claims of cause and prejudice and actual innocence to excuse the default, Judge Svet ordered that counsel be

appointed for Santillanes and that an evidentiary hearing be held. The hearing, held in two parts, addressed the procedural default issue as well as the merits of Santillanes' petition. (Transcripts of the two parts of the hearing will be designated herein as "EH I" for the first hearing held on May 5, 1998, and "EH II" for the second hearing held on April 6, 1999). Judge Svet's recusal occurred after the hearings had been completed and before briefing was submitted by counsel.

6. The record establishes that Santillanes did indeed fail to file for certiorari within the time allotted by New Mexico law. His third state habeas petition was denied on February 21, 1997. Under Rule 12-501(B), N.M.R.A. (2000), Santillanes had thirty days, following this denial, to file his petition for certiorari. The rule does not specify any procedure for extending the filing deadline, and it makes no special provision for *pro se* inmate petitioners. Santillanes' certiorari petition arrived at the supreme court clerk's office on April 1, 1997. It was returned to him along with a letter explaining that the petition should have been filed on or before March 24 and was therefore untimely. (Answer, Ex. P).

7. A failure to seek timely state supreme court review of denial of a state habeas petition constitutes procedural default. <u>Watson v. New Mexico</u>, 45 F. 3d 385, 387 (10th Cir. 1995). At issue in this case is whether Santillanes' petition for certiorari can be considered "timely" under New Mexico law. The Court finds that it cannot.

8. Federal courts generally follow the "mailbox rule" under which an inmate proceeding *pro se* is deemed to have "filed" a document with the federal court when he places it in the prison's outgoing mailbox or delivers it to prison authorities for forwarding to the court clerk. <u>Houston v. Lack</u>, 487 U.S. 266, 108 S. Ct. 2379 (1988) (notice of appeal); <u>Dunn v. White</u>, 880 F.2d 1188 (10th Cir. 1989) (objections to Magistrate's recommended disposition). However,

"[t]he rationale of Houston was not constitutional or equitable in nature; rather, it was based on an interpretation of the word 'filed' and the statute governing the timeliness of notices of appeal." Jenkins v. Burtzloff, 69 F.3d 460, 461 (10th Cir. 1995). A state may constitutionally decide to reject the "mailbox rule," and a federal court may not conduct habeas review based on a state court's interpretation of a state procedural rule governing such matters as when a document is deemed to be "filed." Goudeau v. Ray, 166 F.3d 347 (Table, text in Westlaw), No. 97-5247, 1998 WL 778718, at * 3 (10th Cir. Nov. 9, 1998).

9. The court finds that New Mexico has not adopted a "mailbox rule" for prisoner filings similar to that in use in federal courts. In a recent habeas case, the Tenth Circuit noted:

> We have no indication that the New Mexico Supreme Court has adopted a 'mailbox rule' for inmate certiorari petitions and would consider the petition timely; therefore, we must follow the language of the appropriate state rules and §2244(d)(2) with its requirement of 'properly filed' requests for postconviction relief.

Conner v. LeMaster, 172 F.3d 878 (Table, text in Westlaw), No. 98-2112, 1999 WL 76883, at *1 (10th Cir. Feb. 18, 1999). In Adams v. LeMaster, 172 F.3d 62 (Table, text in Westlaw), No. 98-2222, 1999 WL 80381, at * 3 (10th Cir.. Feb. 17, 1999), the Tenth Circuit noted that it had recently "allowed for the possibility" that the mailbox rule of Houston v. Lack applies to filing of state habeas pleadings, but that it has never actually "squarely addressed the issue." The court sent the Adams case back to the New Mexico District Court to decide whether the rule applies to filings by New Mexico inmates. On remand, the District Judge adopted the recommendation of the Magistrate Judge and held:

> The Court's research reveals that there is no New Mexico statute or rule authorizing application of the mailbox rule for a filing of any type. Instead, Rule 1-005.E, which governs civil procedure in state district

> courts defines 'filing with the court' as filing the pleadings with the
> clerk of court. Rule 12-307, which governs appellate procedure,
> provides that '[f]iling by mail is not complete until actual receipt.'
> Nor are there any New Mexico state decisions, at any level, applying
> or discussing the mailbox rule . . . Absent any binding authority to the
> contrary and absent definitive New Mexico authority applying the
> mailbox rule, the Court will not extend the mailbox rule to the New
> Mexico state courts.

Adams v. LeMaster, No. Civ. 97-1017 JP/KBM, slip op. at 2, 3 (D.N.M. Nov. 10, 1999) (Judge James A. Parker).

10. While sympathetic to Santillanes' argument that the lack of a mailbox rule in New Mexico sets up obstacles to certiorari review which are not faced by persons who are not incarcerated and proceeding *pro se*, the Court cannot agree with Santillanes that "[t]his violates the [due] process and equal protection clauses of the Fifth Amendment." (Memorandum in Support of Petitioner's Non-Procedural Default [Doc. 31], at 10). The Supreme Court has ruled that the mailbox rule is not based on constitutional principles, and this Court must follow that directive. There being nothing in New Mexico law to support the rule, the Court finds that Judge Parker's ruling is persuasive and applicable in the present case.[2]

11. It is true, as Santillanes argues, that failure to follow a state procedural rule will not bar federal habeas review unless the rule represents a "firmly established and regularly followed state practice," James v. Kentucky, 466 U.S. 341, 348, 104 S. Ct.1830, 1835 (1984); that is, the procedural rules must be applied "evenhandedly to all similar claims." Maes v. Thomas, 46 F.3d 979, 986 (10th Cir. 1995). However, the mere fact that there are reasonable exceptions to a general rule

---

[2]United States v. Gray, 182 F.3d 762 (10th Cir. 1999), cited in Petitioner's briefs, is not applicable herein as it involved a federal prisoner filing in federal court and not, as in this case, a state prisoner attempting to make a filing in state court.

does not mean that the rule is not applied evenhandedly, at least where the state does not have "unfettered discretion" to disregard the rule. Jackson v. Shanks, 143 F.3d 1313, 1318 (10th Cir. 1998), cert. denied, 119 S. Ct. 378 (1999).

12. As evidence that the rule is not "regularly followed," Santillanes asserts that the New Mexico Supreme Court has in the past excused the untimely filing of certiorari petitions under "unusual circumstances justifying such late filing," citing, *inter alia*, Serna v. Board of County Commissioners, 88 N.M. 282, 540 P.2d 212 (1975); and Gulf Oil Corp. v. Rota-Cone Field Operating Co., 85 N.M. 636, 515 P.2d 640 (1973)." However, the Tenth Circuit rejected this argument, noting that there is no indication that New Mexico courts routinely fail to enforce the time limit for filing certiorari petitions. Murillo v. Tansy, 13 F.3d 406 (Table, text in Westlaw), No. 93-2075, 1993 WL 498175, at *2 n.2 (10th Cir. Dec. 2, 1993), in which the court noted that in Serna and Gulf Oil Corp., two cases cited herein by Santillanes, the New Mexico Supreme Court ultimately refused to excuse late filings. Whatever discretion the state supreme court has is limited to "unusual circumstances" and is not sufficiently "unfettered" to undermine the stability and evenhanded application of the rule and thereby justify federal habeas review. Murillo, at *1. The time limitation of Rule 12-501 is therefore "firmly established and regularly followed," and failure to comply with it constitutes procedural default.

13. Petitioner also argues that the clerk of the state supreme court had no authority to refuse to file his petition for certiorari, and that the matter should have been considered by the supreme court itself, which, if it had been given the opportunity to consider the circumstances, would have allowed a late filing. The New Mexico Supreme Court, however, delegated its authority to the clerk in this regard by adoption of the Rules of Appellate Procedure (*see*, Rule 12-501: "Petitions for writs

of certiorari shall be filed with the supreme court clerk within thirty (30) days of the district court's denial of the petition"), and the Supreme Court General Rules (*see*, Rule 23-102(H): "It shall be the duty of the clerk to enforce the requirements of these rules and the Rules of Appellate Procedure by refusing to file documents not complying therewith").[3]  The Court finds that the clerk of the New Mexico Supreme Court had authority to refuse to accept Santillanes' untimely petition.  Santillanes failed to file his petition for certiorari within the time allotted by state law following denial of his third petition for habeas relief in the state court, and this failure is an "adequate and independent state ground," constituting a procedural default.

## Which Claims Were Procedurally Defaulted

14.  Santillanes' third, defaulted habeas petition asserted two grounds for relief:  ineffective assistance of counsel and prosecutorial misconduct in failing to reveal exculpatory information which consisted of the identity of informants who allegedly named Santillanes' co-defendant, James Sedillo, as the killer.  These are the same grounds asserted in his federal habeas petition.  Although by defaulting, Santillanes failed to give the state's highest court an opportunity to rule on his claim of ineffective assistance of counsel, the claim of prosecutorial misconduct had earlier been presented to the New Mexico Supreme Court on direct appeal of Santillanes' conviction.  This claim was thoroughly and ably briefed by both sides and was directly addressed in an opinion authored by the Chief Justice.  The court held:

---

[3] The words "and the Rules of Appellate Procedure" were not added to Rule 23-102(H) until 1999. However, there is nothing in New Mexico statute, rule, or case law supporting the argument that, prior to the 1999 amendment, the clerk did not have authority to refuse to file non-conforming documents.  Torres v. Smith's Management Corp., 111 N.M. 547, 807 P.2d 245 (Ct. App. 1991), cited by Santillanes, does not hold otherwise; it says only that the fact that a court clerk accepts a document for filing, when the document should have been filed in a different forum, does not render that document properly and timely filed.

> We determine that, under the facts of the instant case, the informants'
> identities were not material because there is no showing that their
> disclosure to the defense would have changed the results of either the
> guilt/innocence phase or the sentencing phase of the trial . . . [N]o
> denial of due process occurred.

State v. Santillanes, No. 16, 019, slip op. at 5, 6 (N.M. Sept. 3, 1986) (Answer, Ex. F).

15.  In reaching this decision, the supreme court found that the testimony of the informants would have been "neither relevant nor helpful or necessary to a fair determination of guilt or innocence." Their statement was inadmissible hearsay and would have had no effect on either the outcome or the punishment.

16.  The New Mexico Supreme Court's opinion is entitled to deference by this Court. Santillanes' federal habeas petition was filed after the effective date of the Anti-Terrorism and Effective Death Penalty Act, and under that Act this Court must defer to the state court's ruling, unless it was contrary to or involved an unreasonable application of clearly established federal law or was based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. §2254(d); Aycox v. Lytle, 196 F.3d 1174, 1178 (10th Cir. 1999). The Court finds that the holding of the state supreme court is not "legally or factually unreasonable." Id.

17.  Although the prosecutorial misconduct claim cannot be revisited in this habeas proceeding, Santillanes' claim of ineffective assistance of counsel would be considered on the merits if he could establish circumstances excusing his procedural default of this claim. To excuse his default, he has raised issues of fundamental miscarriage of justice, as well as cause and prejudice.

### Fundamental Miscarriage of Justice

18.  Santillanes has been in prison for almost 15 years. In that time, he has never wavered from his assertion of innocence and he now argues, to excuse his procedural default, that a

fundamental miscarriage of justice will occur if his habeas claim is not considered by this Court. A "fundamental miscarriage of justice" will excuse a procedural default only in extraordinary circumstances where a constitutional violation has probably caused the conviction of one actually innocent of the crime. McCleskey v. Zant, 499 U.S. 467, 111 S. Ct. 1454 (1991).

19.     Proof of actual innocence requires more than a mere assertion; rather, "petitioner must present evidence of innocence so strong that a court cannot have any confidence in the outcome of the trial . . . Substantial claims that errors of constitutional dimension have caused the conviction of an innocent person are 'extremely rare.'" Sellers v. Ward, 135 F.3d 1333, 1338 (10th Cir. 1998), cert. denied, 119 S Ct. 557 (1998). Santillanes argues that he was wrongfully prevented from telling the jury his version of the events surrounding the crime; however, in order to override procedural default, a claim of innocence must be so strong that the court must conclude that, if the excluded evidence had been presented at trial, no reasonable juror could have voted to convict the defendant. Id., at 1339. Santillanes has not satisfied the high burden of showing "no reasonable juror would convict him on the basis of the evidence he has presented." Id.

## A. Santillanes' Story

20.     At the evidentiary hearing, Santillanes gave his version of the events of December 24, 1984 and said that if he had been given the chance to testify, he would have told the following story to the jury:

21.     He got home from work that evening and decided to go out and celebrate Christmas Eve with a few beers. He "ran into" James Sedillo ("Sedillo"), and they went out together. Santillanes was driving. The two men bought beer, visited a relative, and eventually ended up drinking at a bar. They left when the bar closed. As they were outside, warming up the car, Santillanes noticed two

men walking out of the bar. It was a cold night, and he asked them if they wanted a ride home. The two men accepted the offer and got into the back seat. (EH II, at 14-17). The two young men were Delbert Bernally ("Bernally") and Bernard McCurtain ("McCurtain"), who had driven in from their homes near Gallup that day and were in Albuquerque doing some shopping and some drinking.

22. Santillanes said that after the two men got into the car, one of them asked Santillanes if he could get them some marijuana. Santillanes agreed. They drove around for awhile, stopping for more beer, and ending up on the west mesa outside of Albuquerque. Santillanes said he could get marijuana on the west mesa because, about once a month, a small plane would fly over the mesa and drop off small quantities of marijuana before going on to land at Coronado airport. He said he could get marijuana from persons involved in this operation who came to the mesa to pick it up. He thought the plane might be landing that night. (EH II, at 17-19).

23. When they arrived at the drop-off spot, no one was there. They drove around for awhile, then pulled over so they could all urinate. Santillanes said that he and Bernally got out on one side of the car, and Sedillo and McCurtain got out on the other. All of a sudden, he said, Bernally grabbed him by the pockets, then started to run away. Santillanes said he wasn't sure what had happened, but he thought Bernally may have taken his billfold. He gave chase and, although he says he did not have a weapon that night, he shouted after Bernally, "Am I going to have to shoot you or something?" He lost track of Bernally and began to feel sick from the effects of beer and exertion. He says he stopped to throw up several times on the way back to the car. (EH II, at 19-20).

24. When he got back to the car, James Sedillo was standing there with a reddish stain on his white sweater. Santillanes said he asked where the other guy went, and Sedillo answered, "I killed the fucking punk" and threw his body into a field. Santillanes didn't ask Sedillo why he killed

McCurtain; instead, he said, "I didn't want to know why. I just wanted to leave the area. I don't know why it happened. I wish it would have never happened." He and Sedillo then got into the car and left the area. He stated that it was never his plan to rob anyone, and that he didn't take anything from either man that night. He doesn't know whether Sedillo took anything from McCurtain before he stabbed him. (EH II, at 20-22). Santillanes stated further that he told his attorney that there was no robbery planned that night, and the killing "was just something that happened that should have never happened." (EH II, at 24).

25. Santillanes said in his testimony that Bernally, "[t]he . . . person who got away," testified at trial that neither Santillanes nor Sedillo showed any weapons or asked for any money at any time. (EH II, at 37). Bernally's actual testimony at trial does not specifically contradict this statement, but it does paint a different picture of the situation.

## B. Bernally's Story

26. Bernally testified that he and McCurtain drove into Albuquerque from their homes near Gallup on Christmas Eve 1984, for the purpose of buying some wheels for a vehicle. They were both in their early twenties at the time and had been close friends since high school. That evening, after doing their shopping, they stopped in a bar in Albuquerque and stayed for several hours. Bernally stated that they were drunk when they left the bar and began to walk back to their hotel. He said that a car pulled up and the driver (later identified as Santillanes) asked if they wanted a ride. They accepted, and when they were in the car, McCurtain asked if the two men could find some marijuana for himself and Bernally. Santillanes said he could get some good stuff for them at a place outside of town, where an airplane would be dropping it off around 2:15 a.m. Bernally said that Santillanes asked them how much marijuana they were willing to buy, and how much money they had.

McCurtain told Santillanes that Bernally had money.  (Record Proper, <u>State v. Santillanes</u>, Cr. No. 39227, Bernalillo, Cassette Tape #10, at counters 490-650).[4]

27.  Bernally testified further that while they were driving, Santillanes and Sedillo spoke to each other in Spanish from time and time, and he couldn't understand what they were saying.  (Tape 10, at 785-788, 1167-1182).  Santillanes drove to a remote place in the hills outside of town, leaving the paved streets and driving out along on a dirt road.  Bernally could see the lights of houses in the vicinity, but they were approximately two miles away.  (Tape 10, at 684-748).

28.  The car stopped and they all got out to urinate.  Bernally and Santillanes were standing on the driver's side of the car, McCurtain and Sedillo on the passenger's side.  As they were standing there, Bernally said, Santillanes leaned back into the car for a moment.  When he emerged, he gave Bernally a "vicious" look.  Bernally was scared.  He reached out toward the pocket of Santillanes' windbreaker in an attempt to frisk him and felt something hard, like a box, in the pocket of the windbreaker.  (Tape 10, at 765-825).

29.  At this point, Bernally became very frightened and took off running.  He stumbled for a moment but got up and continued running, going toward the lights for help.  Santillanes chased him for quite a way, at one point shouting out, "Aren't you doing to stop, or do I have to shoot?"  Bernally was able to outrun Santillanes and eventually reached a house where he obtained help and was able to call the police.  He did not know at the time what had happened, or was going to happen, to his friend McCurtain.  (Tape 10, at 834-900).

---

[4] Trial tapes will hereafter be referred to in the form:  "Tape 10, at 490-650."  The tapes were played on a Pitney-Bowes Dictaphone, Model 2870.

## C. Sedillo's Story

30.  Santillanes' story also differs significantly in several particulars from the testimony of James Sedillo.  Sedillo testified at trial that he was with Santillanes and watched him stab and kill McCurtain.  He said that he did not stab or kill anyone himself and did not participate or encourage Santillanes in any way.  His testimony parallels Santillanes' up to the point where they saw Bernally and McCurtain leaving the bar that Christmas Eve.  Sedillo testified that he and Santillanes had not hatched a plot to rob anyone until the moment they saw the two men walking away from the bar.  At that point Santillanes asked Sedillo, "You want to make some money?"  Sedillo said, "Yeah."  Sedillo understood, as they slowed down and pulled over to offer the two men a ride, that he and Santillanes were going to rob the men.  Sedillo also knew that Santillanes regularly carried a knife in his pocket with a five-inch blade.  (Tape 11, at 480-487, 875-895, 1040-1055; Tape 13, at 478-500, 671-675).

31.  Sedillo said that after the two men got into the back seat of the car, one of them asked whether Santillanes and Sedillo could get them some marijuana.  Sedillo said he didn't know Santillanes would make up the story about the plane drop, and he was surprised at it, but he didn't say anything and went along with it.   He confirmed that they drove around for awhile and ended up on a dark portion of the west mesa, where they stopped to urinate.  Sedillo said he couldn't see what Santillanes and Bernally were doing outside on the other side of the car, but he did notice at one point that they were both gone for 10 to 15 minutes. Sedillo further testified that when Santillanes returned, he told Sedillo that Bernally had taken off running.  Meanwhile, McCurtain was still seated in the back of the car.  (Tape 11, at 1082-1155).

32.  Sedillo then saw Santillanes lean into the car, place his knife at McCurtain's chest, and tell McCurtain to give them his money.  McCurtain put his hand into his pocket, pulled out some

paper, and told Santillanes he didn't have any money. He was scared. Santillanes then got furious, stabbed McCurtain in the chest and told him to get out of the car. McCurtain did so and tried to run away but, Sedillo testified, Santillanes jumped him and they both fell to the ground. Santillanes got up, stood over McCurtain, and continued to stab him for about 20 minutes. Sedillo said he stood in front of the car during the stabbing, not knowing what to do. (Tape 12, at 40-47, 80-183).

33. Eventually, Sedillo said, he realized the man was dead, but Santillanes continued to stab him. He tried to pull Santillanes off McCurtain and cut his hand in the process. Santillanes pulled away from Sedillo, leaned back down and slit McCurtain's throat. Sedillo said he was scared of Santillanes at this point. He thought Santillanes might kill him. They got back into the car and as they drove away, the knife still in his hand, Santillanes told Sedillo he didn't want anybody to know about this. Sedillo testified that although they had planned to rob these men of their money, he never thought that anyone would get killed out there, and he did not take any part in the actual killing. Neither he nor Santillanes managed to get any money from either of the men. (Tape 12, at 183-325).

## D. A Reasonable Juror's Conclusions

34. This was a felony-murder case in which the underlying felony was attempted robbery.[5] Santillanes' position that he is actually innocent is based on his assertion that he neither stabbed McCurtain, nor plotted a robbery attempt, so that he is not responsible for Sedillo's actions under the felony-murder doctrine. He argues that, if he had been allowed to tell the jury the same story he told at the evidentiary hearing, he would have been acquitted. He would have been acquitted, however, only if the jury believed him. The question before the Court is whether, after hearing Satnillanes'

---

[5] For a statement of the felony-murder rule in New Mexico, *see* State v. Harrison, 90 N.M. 439, 564 P.2d 1321 (1977), cited in State v. Santillanes (Answer, Ex. F, at 5).

story, any reasonable juror would still have believed Sedillo and voted to convict.

35. Santillanes said that there was never any plan to rob Bernally and McCurtain, and no attempt was made to do so. He says that after they stopped on west the mesa, he and Bernally got out on one side of the car, and Sedillo and McCurtain got out on the other side. When Bernally bolted for reasons unknown to Santillanes, he gave chase, calling after Bernally to stop and asking him, "Am I going to have to shoot you or something?" (EH II, at 20). After Bernally "got away," Santillanes returned to the car where, he says, he found Sedillo stained with blood, saying he had killed McCurtain and thrown his body into a field.

36. There is nothing objective in Santillanes' story that makes Sedillo's story any less likely. His testimony provides no evidence or details which a reasonable juror could use to discredit Sedillo's version of events. In his statement, Santillanes did not give many details of the party's attempts to obtain marijuana that night. Did they talk to anyone? Go to any houses? Look in a particular spot on the mesa where marijuana may have been left? Santillanes does not say. Sedillo testified that their purpose in taking the two men to a remote spot away from the city was not to get marijuana, but rather to rob the men, to "make some money." Santillanes' story is not objectively more believable than Sedillo's.

37. There is conflicting testimony as to who actually did the stabbing, but it would have been unnecessary for the jury to resolve that conflict in this felony-murder case. What is not in conflict is that, after the stabbing was over, Santillanes and Sedillo drove off and left McCurtain's body on the mesa, where it was not discovered until several days later when a balloonist spotted it from the air. His story of airplanes dropping marijuana on the west mesa is not particularly credible. It certainly surprised Sedillo. Santillanes' testimony is singularly devoid of telling details to support the claim

that he and Sedillo had only benevolent intentions toward these two men – that they went to the mesa to share a friendly joint, or to obtain marijuana for the men in a commercial transaction. In addition, Santillanes testified that when he returned to the car and saw Sedillo with blood on his sweater and a dead man in the field, he didn't ask Sedillo what he was doing, and why he had killed this man. If Santillanes and Sedillo had good intentions toward these men, if they were just giving them a ride home because it was a cold night, or trying to help them find some marijuana, a reasonable juror could conclude that Santillanes would have asked Sedillo, at the least, what could possibly have led him to do such a thing. He says he didn't do that; rather, they just got back in the car and drove away. (EH II, at 21).

38. Santillanes' attorney testified that he felt the state had a weak case in that Sedillo was not a credible witness. However, he felt that Santillanes' credibility would not stand up to cross-examination either, especially given his prior record. Each man obviously had an incentive to blame the other. Under all the circumstances, this is not one of those "extraordinary" cases in which the Court can say that no reasonable juror could have found Sedillo's testimony more credible than Santillanes' or that no reasonable juror would have been unfavorably influenced by Santillanes' prior record. Santillanes has failed to meet his burden of showing that no reasonable juror, after hearing his story, would have concluded that he and Sedillo took the two men out to the mesa with the intention of robbing them. There has been no "fundamental miscarriage of justice" in this case.

## Cause and Prejudice

39. Santillanes also asserts "cause and prejudice" to excuse his procedural default. If a petitioner has defaulted a claim in state courts on the basis of an adequate and independent state procedural ground, a federal court will not consider the issue on habeas review, unless the petitioner

can either demonstrate that failure to consider the claim will result in a fundamental miscarriage of justice (which, as discussed above, Santillanes has failed to do), or establish good cause for the default and prejudice resulting from his inability to present his claims in state court.  Coleman v. Thompson, 501 U.S. 722, 750, 111 S. Ct. 2546, 2565 (1991); Romero v. Tansy, 46 F.3d 1024, 1027 (10th Cir. 1995).

### A.  Cause

40.  To establish "cause," the petitioner must show that some objective factor, external to the defense and not attributable to petitioner, impeded his compliance with state procedural rules.  Rodriguez v. Maynard, 948 F.2d 684, 687 (10th Cir. 1991); Watson, at 388.

41.  Santillanes argues that he had good cause for failing to timely file his petition for writ of certiorari.  The thirty-day filing period ran from February 21 to March 24, 1997.  He testified that, at the time he received notice that his third petition for certiorari had been denied, the prison was in lockdown status.  (EH I, at 14).  He said that in order to prepare his petition, he needed the assistance of Robert Chappell ("Chappell"), another inmate with greater knowledge of the law, and that he had no opportunity to speak to Chappell while the prison was in lockdown status because they lived in separate cellblocks.   After the lockdown ended, he was able to speak with Chappell only briefly during the 20-minute meal breaks at the prison chow hall but eventually was able to get an appointment to meet with him at the prison law library.  (EH I, at 15-19).  He testified further that he met with Chappell in the law library on two or three occasions.  They eventually finished the petition on March 19, 1997 and placed it in the prison mailbox outside the law library that same day, witnessed by Corrections Officer Andy Ray.  (EH I, at 19-21).

42.  Santillanes stated that he was confident the petition had been mailed in enough time  to

reach the Supreme Court by the March 24 deadline. (EH, at 21). Chappell, who had more experience than Santillanes with preparing and mailing legal documents, submitted an affidavit in which he confirmed Santillanes' version of events, including the March 19 mailing date. Chappell stated that he, too, was confident about the timing, since it seemed to him that the petition had been mailed in plenty of time to arrive by the deadline. (Affidavit of Robert Chappell [Doc. 26]).

43. Elmer Bustos, Deputy Warden at the New Mexico State Penitentiary, submitted an affidavit in which he confirmed that there was a lockdown at the main facility of the penitentiary from February 19 to April 3, 1997. He stated that during a lockdown there is minimal contact between inmates, and certain programs and services are suspended; however, as the institution comes off of lockdown, the inmates are progressively reintroduced to the various programs and services. Access to the prison law library was restored by March 5. (Affidavit of Elmer Bustos [Doc 28]).

44. Dora Urban, Supervisor of the Correspondence Department at the penitentiary, stated in an affidavit that mail is picked up daily from the prison mailboxes, including the box for outgoing legal correspondence located in front of the prison law library. It is then taken to the mail room and sorted, placed in outgoing mail, and taken to a United States postal facility. She stated further that the penitentiary is not required to and does not keep a log of outgoing legal mail, that the institution provides free postage for all legal mail, and that during a lockdown mail is dispatched in a timely manner with no suspension of mail service. (Affidavit of Dora Urban [Doc. 29]).

45. A bare allegation of lockdown status does not fulfill a petitioner's burden of showing an inability to meet a filing deadline. United States ex rel. Westbrook v. Detella, No. 94 C 7695, 1995 WL 692238, at *5 (N.D. Ill. Nov. 21, 1995). Unless the lockdown status prevented all access to the prison law library during the period for filing, and unless the petition required legal research beyond

what the inmate had already done in preparing the state habeas petition, he has not shown "cause" based on lockdown status.  Bell v. Detella, 124 F.3d 203 (Table, text in Westlaw), No. 96-1667, 1997 WL 471322, at *1 (7th Cir. Aug. 12, 1997);  Maciel v. Carter, 22 F. Supp. 2d 843, 857 (N.D. Ill. 1998).

46.  The evidence indicates, and the Court finds, that Santillanes mailed his petition on March 19, 1997, but it did not reach the state supreme court until April 1.  There is no explanation for this delay.  The only reasonable inferences are that the delay occurred at the prison after Santillanes mailed the envelope, at the post office, or at the supreme court.   In any case, the delay would not have been attributable to Santillanes.

47. It appears from the affidavits of prison officials that the lockdown would not have prevented Santillanes from mailing his petition for certiorari at any time after he received notice of denial of his habeas petition.  However, it was not unreasonable for him to expect that an envelope would reach its destination, at another location in the same city, within 5 days, nor was it unreasonable for him to wait until he could obtain the assistance of a prison law writer whose greater knowledge of the law could help him prepare a petition with a better chance of success than if he attempted to prepare it himself.  He does not claim that he needed the law library to research the legal grounds for the petition, but rather that the library was the only place in the prison where he could meet with Chappell for assistance.

48.  Although Santillanes goes a long way toward showing cause for his procedural default, the Court does not find it necessary to decide whether this showing is sufficient, because Santillanes has failed to show "actual prejudice resulting from the alleged errors."  United States v. Talk, 158 F.3d 1064, 1067 (10th Cir. 1998), cert. denied, 119 S Ct. 1079 (1999).

B.  Prejudice

49.  The errors alleged by Santillanes are the failure of his attorney to use a polygraph test and

failure to allow Santillanes to testify at trial on his own behalf, constituting ineffective assistance of

counsel.  Where the defaulted claim is one of ineffective assistance of counsel, the standard for

determining prejudice under the "cause and prejudice" dictate is the same as the standard used to

determine prejudice under the Strickland test for ineffective assistance of counsel.  Hollis v. Davis,

941 F.2d 1471, 1479-80, 1483 (11th Cir. 1991):

> The terms 'cause' and 'actual prejudice' are not rigid concepts; they
> take their meaning from the principles of comity and finality . . . To
> establish actual prejudice, a petitioner must show 'not merely that the
> errors at his trial created a possibility of prejudice, but that they
> worked to his actual and substantial disadvantage, infecting his entire
> trial with error of constitutional dimensions.'  . . .  A petitioner shows
> prejudice due to ineffective assistance of counsel when 'there is a
> reasonable probability that, but for counsel's constitutional errors, the
> result of the proceedings would have been different.  A reasonable
> probability is a probability sufficient to undermine confidence in the
> outcome.' [Citing Strickland v. Washington, 466 U.S. 668, 694, 104
> S. Ct. 2052, 2068 (1984)].

50.  Therefore, if Santillanes can show prejudice sufficient to excuse his procedural default

in failing to file a timely certiorari petition, he will necessarily have shown the prejudice needed to

establish ineffective assistance of counsel.  Conversely, if he fails to satisfy the prejudice prong of the

"cause and prejudice" test, he will necessarily have failed to establish the second, crucial prong of

ineffective assistance under Strickland, and his claim would be denied on the merits, even if he were

able to escape the procedural bar.  The Court finds that Santillanes failed to show a reasonable

probability that, but for counsel's constitutional errors, the result of the proceedings would have been

different.

51.  This is a less stringent standard than that required to establish a "fundamental miscarriage of justice," discussed above (that standard being that no reasonable juror could have convicted the defendant if he had testified at trial).  Nevertheless, many of the same factors are relevant to the "cause and prejudice" analysis which, in connection with this ineffective assistance of counsel claim, requires the Court to determine whether Santillanes has shown a reasonable probability that the outcome would have been different if he had testified or if his attorney had advised him to take a polygraph test.

52.  As discussed below under the "Polygraph Examination" heading, there is no evidence that Santillanes would have passed a polygraph test if it had been adminstered, and in any case, the Court cannot say there is a reasonable probability that the results would have been admitted into evidence; a number of now-unknowable factors would have to have been considered by the trial court.  *See* Rule 11-707 of the New Mexico Rules of Evidence. In addition, Santillanes' story of the unfolding of the events of December 24, 1984 does not raise a reasonable probability that, if he had been allowed to tell it, the jury would have concluded that he was not engaged in an attempted robbery at the time McCurtain was killed.  He has, thus, failed to meet his burden of showing that the outcome would have been different if he had taken the stand.

53.  As noted above, Santillanes' stated reason for driving to the west mesa with Bernally and McCurtain, that an airplane might be dropping marijuana there, is not particularly credible.  This story, in fact, caught Sedillo by surprise.  In addition, Santillanes testified at the evidentiary hearing that he shouted after the fleeing Bernally, "Am I going to have to shoot you or something?"  This statement, even if prompted by the mistaken impression that Bernally had stolen his billfold, does not tend to show that Santillanes had benevolent intentions toward the two men, nor does his description

of Bernally as "the person who got away" indicate that the events on the west mesa were an innocuous, if drunken, Christmas Eve celebration. Rather, portions of Santillanes' testimony tend to support the conclusion that Santillanes was engaged in an attempted robbery, in the course of which McCurtain was killed. This testimony would not have had a tendency to change the outcome of this felony-murder trial. Finally, Santillanes' prior record, which gave his attorney such misgivings about putting him on the stand, would not have been a credit to him with the jury.

54. The burden remains on the petitioner to show that any deficiencies in his attorney's performance prejudiced his defense, Strickland, 466 U.S. at 687; Gillette v. Tansy, 17 F.3d 308, 310 (10th Cir.1994); that is, he must establish a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Strickland, 466 U.S. at 694. "It is not enough for a defendant to show that the errors had some conceivable effect on the outcome of the proceeding . . . A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 693, 694. Santillanes has not met this burden.

55. Santillanes has not shown cause and prejudice, or a fundamental miscarriage of justice, and has therefore failed to excuse his procedural default. However, even if there had been no procedural default on the issue of ineffective assistance of counsel, or if the procedural default had been excused, Santillanes could not prevail on the merits of his ineffective assistance claim because he has failed to show that his attorney's performance was deficient.

### Counsel's Failure to Call Santillanes to Testify

56. To establish ineffective assistance, Santillanes has the burden of meeting a two-prong test. He must show not only that his attorney's performance fell below an objective standard of reasonableness, but also that there is a reasonable probability that but for counsel's unprofessional

errors the result of the proceeding would have been different. Strickland; Tapia v. Tansy, 926 F.2d 1554, 1564 (10th Cir. 1991). Santillanes has failed to satisfy either prong of this test.

57. Santillanes argues that his attorney was ineffective in advising him not to testify in his own behalf at trial, and in failing to make clear that the decision whether or not to testify was ultimately Santillanes' to make, rather than counsel's. He also asserts error by counsel in failing to order a polygraph test and to have the results admitted into evidence.

58. Because it is "the accused, who above all others may be in a position to meet the prosecution's case," Ferguson v. Georgia, 365 U.S. 570, 582, 81 S. Ct. 756, 763 (1961), the testimony of a criminal defendant at his own trial is unique evidence and is inherently significant. United States v. Lore, 26 F. Supp. 2d 729, 740 (D.N.J. 1998). The decision whether the defendant should testify is particularly difficult and has tremendous strategic importance in a criminal trial. United States v. Von Roeder, 435 F.2d 1004 (10th Cir. 1970), *vacated on other grounds*, 404 U.S. 67, 92 S. Ct. 326 (1971); United States v. Teague, 953 F.2d 1525 (11th Cir. 1992). In Rock v. Arkansas, 483 U.S. 44, 51, 107 S. Ct. 2704, 2709 (1987), the Supreme Court held that the right of a criminal defendant to testify at his own trial is constitutionally protected, having its "sources in several provisions of the Constitution," including the Fifth, Sixth, and Fourteenth Amendments. The Supreme Court has never held, however, that the right to testify is a fundamental right which an attorney cannot waive on behalf of his client, although several circuit courts have so held; *see, e.g.*, Teague, at 1531-32.

59. The Tenth Circuit has noted that the decision whether to place the defendant on the stand "has generally been treated as a question of trial tactics." Von Roeder, 435 F.2d at 1009. However, the circuit has also held, in an unpublished opinion:

23

> When a defendant asserts that he desires to exercise his constitutional right to testify truthfully, counsel's duty is to inform the defendant why he believes this course will be unwise or dangerous. If a defendant insists on testifying, however irrational that insistence might be from a tactical viewpoint, counsel must accede.

United States v. Hershberger, 940 F.2d 671 (Table, text in Westlaw), 1991 WL 136337, at *2 (10th Cir. July 24, 1991). In other published opinions, the circuit has held that the decision whether or not to testify is ultimately the defendant's to make rather than counsel's, that counsel has a duty to advise defendant of this fact, and that failure to do so constitutes ineffective assistance. Wimberly v. McKune, 141 F.3d 1187 (Table, text in Westlaw), No. 97-3133, 1998 WL 115953, at *3 (10th Cir. March 16, 1998); United States v. Dryden, 166 F.3d 1222 (Table, text in Westlaw), 1998 WL 930582, at *1 (10th Cir. Apr. 22, 1998). "If defendant can prove that his counsel prevented him from testifying by asserting that counsel, rather than defendant, would make the decision whether defendant would testify, defendant would be entitled to relief." Hershberger, at *2. The Court will assume that, in this circuit, a defendant's right to testify is considered to be a "fundamental" constitutional right which is not waivable by counsel.

60. To establish that his attorney's conduct was deficient, thus satisfying the first prong of Strickland, Santillanes must show that the attorney refused to accept his decision to testify or otherwise prevented him from testifying, or else failed to inform him that he could override the attorney's advice on this matter. Brown v. Artuz, 124 F.3d 73, 74 (2d Cir. 1997), cert. denied, 552 U.S. 1128, 118 S. Ct. 1077 (1998); Teague, at 1534; Dryden, at *1. In "drawing the difficult line between earnest counseling and the overt coercion which amounts to ineffective assistance," the court should consider whether the defendant was aware of his constitutional right to testify, whether counsel informed him of it, the competence and soundness of counsel's tactical advice, and any

intimidation or threatened retaliation by counsel with respect to defendant's testimonial decision. <u>Wimberly</u>, at *3.

61.  It is clear in the present case that Santillanes was aware that he had a right to testify in his own behalf.  This was not his first encounter with the criminal justice system and, in addition, he said at the evidentiary hearing that his attorney, Joe Riggs ("Riggs"), talked to him about whether or not he should testify.  (EH II, at 6).  Riggs testified at the evidentiary hearing  that he discussed the question with Santillanes as to whether or not he should testify, and the fact that Santillanes had a prior record entered into the discussions.  (EH II, at 49).  Riggs felt at the time that, due to his client's prior record, Santillanes ran a great risk of hurting his case if he testified; indeed, he felt that the danger outweighed the benefits, especially since the prosecution had a weak case with what he considered to be a poor star witness in Sedillo.  (EH II, at 49-51).  Riggs' strategy throughout the case was to keep the jury's focus on Sedillo's poor credibility, and to shift the blame from Santillanes to Sedillo.  (EH II, at 49, 53).

62.  Santillanes confirmed that Riggs told him it was neither necessary nor in his best interest to take the stand because the prosecution had a weak case and because, if he testified, evidence concerning his prior convictions would be admitted.  (EH II, at 7-8).  Santillanes said that he thought "he really didn't have to" take the stand (EH II, at 10).  He did not say that he thought he "couldn't" take the stand, or that he disagreed with his attorney's assessment of the dangers of testifying but his "will was overborne" by counsel, as in <u>Teague</u>.  In that case, "the Defendant was advised of his right to testify, was advised that he should not exercise that right, and did not protest [internal punctuation marks omitted]."

63. Santillanes stated that Riggs did not tell him he had the right to testify in spite of counsel's advice; rather, the attorney said only that testifying would not be in Santillanes' best interest. (EH II, at 9). Santillanes never said, however, that he was not aware from other sources that he could override his attorney's advice in the matter of taking the stand. He had past experience with the criminal justice system — enough, indeed, that his attorney felt his past record would be highly prejudicial if revealed to the jury. He had recently been convicted of a serious violent crime in federal court. (Petitioner's Motion to Recuse [Doc. 49]). A petitioner's "experience and education in the criminal justice system" is one factor the court should consider in determining whether he was aware of his constitutional right to testify and understood the respective roles of attorney and client in making that decision. Wimberly, at *4. Asked whether he understood that he could testify regardless of his attorney's advice, Santillanes answered, "I didn't really understand that at the time. I thought I really didn't have to." (EH II, at 9-10). Santillanes did not say that his attorney told him he could not testify, or told him that the decision was not his to make. Rather, his testimony is that he followed his attorney's advice and assumed that it was correct: he thought he "really didn't have to" testify, because it wasn't necessary. This is similar to the situation in Teague, where defendant was aware of his right to testify, was advised that he should not testify, and made no protest.

64. Santillanes stated that, in the course of discussions as to whether he should testify, he told his attorney that he would like to take the stand. He said that the reason he ultimately did not testify at trial was because his attorney felt that it wasn't necessary and would be harmful; he did not say that his attorney prevented him from testifying. (EH II, at 6-7). Santillanes also said that he had no further discussions with counsel about this matter, even after it was clear that the judge would not

order the prosecution to reveal the identities of the informants who initially named James Sedillo as the killer, and that the jury would not hear any evidence to that effect. (EH II, at 25). Santillanes' testimony seems to indicate that these conversations, in which he told his attorney he wanted to testify, occurred early in the course of their relationship and did not continue throughout the trial. However, Santillanes contradicted himself later in his testimony, asserting that, on the last day of trial, he told his attorney that he wanted to testify and asked him if it was too late to take the stand. (EH II, at 36).

65. Riggs testified that he did not specifically recall a conversation with his client on the last day of trial during which Santillanes expressed his desire to testify but added that it was his normal practice, as the trial proceeded, to reassess strategy on the matter of whether a client should testify. (EH II, at 52). He said that he believed from the beginning that Santillanes was innocent, and he recalled discussing with Santillanes "on several occasions" the question of whether he should testify but came to the conclusion, as he watched the case unfold, that the prosecution had a weak case, that the jury would have reasonable doubt as to his client's guilt, and that Santillanes had more to lose by exposing his prior record to the jury than he had to gain by telling his story. (EH II, at 50-51). This remained Riggs' conviction throughout the trial. (EH II, at 53).

66. There is no indication that Santillanes insisted that he be allowed to testify, as defendants in other right-to-testify cases have done. The defendants in both United States v. Pennycooke, 65 F.3d 9, 11 (3d Cir. 1995), and Ortega v. O'Leary, 843 F.2d 258 (7th Cir. 1988), for example, repeatedly interrupted their trials to express their desire to testify. The defendant in Lore, *supra*, told his attorneys several times throughout the course of a four-week trial that he wanted to testify. On the last week of trial, when the defendant approached his lead trial attorney in the hallway outside the

courtroom and asked when he was going to take the stand, the attorney informed him for the first time that he was not going to be allowed to testify. When defendant protested, counsel told him he would get "killed" on cross-examination, said "you're not testifying," and walked off, leaving his client standing, stunned one would presume, in the hallway. The attorney in <u>Lore</u> made clear to his client, and to the court in a post-trial hearing, that he "called the shots in the case," "made all the policy decisions" and that "it was . . . my case." The attorney stated further that he felt that he, not the defendant, had the right to make that decision, and that he purposely ignored his client's stated desire to take the stand. The court found that defense counsel's performance fell outside the wide range of professionally competent assistance. The present case does not present such a compelling situation. Santillanes does not allege that Riggs refused to let him testify in spite of his repeated requests, or told him that the attorney was the one who "called the shots" in that regard.

67. In <u>Von Roeder</u>, *supra*, one of the defendants alleged that he was denied effective assistance of counsel when he told his attorney, shortly before the defense rested, that he wanted to testify. The attorney approached the bench and told the judge that his client wanted to testify but that he could not in good conscience put his client on the stand. He asked to be allowed to withdraw if defendant were allowed to testify, but the judge refused to let him. At a hearing outside the presence of the jury, and after a warning from the judge as to the dangers of cross-examination and perjury, the defendant continued to insist that he be allowed to testify. The judge then informed the defendant of counsel's request to withdraw and the fact that the request had been denied, and it was only at this point that the defendant conferred with counsel and ultimately told he the court he would go along with his attorney's advice. The Tenth Circuit found that this procedure did not violate the defendant's right to effective assistance of counsel nor deprive him of his right to testify. A client's

acquiescence, even reluctant acquiescence, in counsel's sound advice not to testify does not amount to deprivation of a constitutional right. United States v. Ortiz, 82 F.3d 1066, 1072 (D.C. Cir. 1996); Teague, at 1535.

68. Santillanes does not contend that he repeatedly asked to testify at trial and was rebuffed by his attorney. There is no indication that Riggs was aware that Santillanes had a strong desire to testify, nor that he had any reason to think that Santillanes had not acquiesced in the decision, or was unaware of his right to disagree with counsel. The record does not show any attempt by Riggs to coerce his client with threats to withdraw. The Court cannot say that his advice was unsound. Riggs was concerned that Santillanes' prior criminal record would have been exposed to the jury if he had testified; indeed, Santillanes sought recusal of Judge Svet in this case based on the fact that, while working in the U.S. Attorney's office before being named to the bench, the judge could have acquired knowledge of Santillanes' rape conviction, which involved "egregious and outrageous circumstances." *(See*, Petitioner's Motion to Recuse [Doc. 49], at 1-2.). "There are good tactical reasons why it may not be best for the defendant to testify in some circumstances. Some examples might be . . . if the defendant might be prejudiced by revelation of prior convictions." Teague, at 1533 n.9.

69. In sum, it appears that this is a case where defendant's "purported dissatisfaction with counsel's performance came only through the convenience of hindsight." Brown v. Artuz, at 76. "While a criminal defendant often has good reasons not to testify during trial, after conviction, the impulse to claim that his attorney 'would not let him' becomes compelling." Lore, at 737. The Court finds that, under all the circumstances of this case, Riggs did not violate his client's constitutional right to decide for himself whether to testify at trial, and his performance did not fall below the

standards of professionally competent representation. Furthermore, for the reasons discussed above under the "Cause and Prejudice" heading, Santillanes cannot show that he was prejudiced by his attorney's failure to have him take the stand in his own defense. He has therefore failed to meet his burden on either prong of Strickland.

## Polygraph Examination

70. Santillanes also argues that, because this case turned primarily on conflicting testimony by participants in the events leading to the killing of Bernard McCurtain, his attorney's performance was inadequate in that Riggs should have had arranged for a polygraph test and should have attempted to introduce the results at trial. Santillanes testified at the evidentiary hearing that he asked Riggs if a polygraph would be of any help. He says that Riggs responded that the test results would not be admissible at trial. (EH II, at 26-27). Santillanes also claims that he took and passed a polygraph exam twelve years later, in 1997. (EH II, 31-32).

71. Riggs testified that he did not remember discussing the possibility of a polygraph with Santillanes but that it was his consistent policy to have one done if a client requested it. He said he used polygraphs "fairly extensively" at that time, and it was his practice to raise the issue with a client whenever he thought a polygraph would be appropriate. (EH II, at 44-45, 47). In retrospect, Riggs said, it might have been appropriate in this case to have Santillanes take a polygraph test; however, Santillanes would have had to testify at trial if the results were to be used in court, and because of Santillanes' prior record and the weakness of the State's case, Riggs did not think that it would be wise or necessary for him to testify. (EH II, at 49-50).

72. Polygraph evidence was generally admissible in New Mexico courts at the time of Santillanes' trial in 1985, as long as certain guidelines were followed. Rule 707 of the New Mexico

Rules of Evidence and Rule 28 of the New Mexico Rules of Criminal Procedure were promulgated by the state supreme court in 1983; they allowed for the introduction of polygraph evidence under certain procedural restrictions. As was pointed out in Tafoya v. Baca, 103 N.M. 56, 60, 702 P.2d 1001, 1005 (1985), an opinion issued a few days after Santillanes' trial had ended, under each of these rules, polygraph test results would not be discoverable by the State unless the defendant had given notice of his intent to introduce the results into evidence at trial. From this, Santillanes argues in his brief that "[t]he failure of defense counsel to even have his client take polygraph examination is an inexcusable and inexplicable failure to meet professional standards." (Petitioner's Memorandum Brief in Support of His Petition [Doc. 54], at 16). The Court does not agree.

73. Riggs' failure to use a polygraph examination at Santillanes' trial was not based on ignorance of New Mexico law on this subject, or a misconception that simply having his client take the exam presented any risk; he stated that he used polygraphs extensively during this period. In addition, Riggs testified that the use of polygraph evidence in this case would have required Santillanes to take the stand, an action which he reasonably believed would hurt his client's case. Santillanes did not take a polygraph in 1985, and his testimony that he passed one in 1997 is unsupported by any evidence. There is, therefore, no way to know whether the results would have been helpful or harmful to him, and in any case there is no guarantee that the results would have been admissible at trial. Riggs' actions in this regard were within the broad range of reasonable representation.

74. In hindsight, Riggs said, perhaps it would have been a good idea to order a polygraph test, (EH II, at 47), although he had good reasons for not doing so at the time. We are admonished to avoid "the distorting effects of hindsight" in evaluating claims of ineffective assistance. Miles v.

<u>Dorsey</u>, 61 F.3d 1459, 1474 (10th Cir. 1995).  To be constitutionally ineffective, trial counsel's performance must have been completely unreasonable, not merely wrong, so that it bears no relationship to a possible defense strategy.  <u>Hoxsie v. Kerby</u>, 108 F.3d 1239, 1246 (10th Cir. 1997).  Counsel's actions with regard to a polygraph test were not "completely unreasonable" in this case.

### Conclusion

To summarize: Santillanes procedurally defaulted his claim of ineffective assistance of counsel and has failed to show cause and prejudice, or a fundamental miscarriage of justice, to excuse this default.  Even if there were no procedural bar, Santillanes would not prevail on the merits of his claim as he has not shown deficient performance by counsel based on his attorney's failure to call him as a witness at trial or to employ polygraph evidence.

### Recommended Disposition

That Santillanes' petition be denied and this action be dismissed with prejudice.


_____
Lorenzo F. Garcia
United States Magistrate Judge