IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

FILED

UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

98 MAY 11 PM 1:34

CLERK - ALBUQUERQUE

ANDREW MICHAEL SANTILLANES,

                    Petitioner,

vs.                                          No. 97-CV-549 LH/DJS

TIM LEMASTER,
Warden,

                    Respondent.


<u>EVIDENTIARY HEARING</u>


        BE IT REMEMBERED that the above-entitled matter came on for hearing before the Honorable DON J. SVET, United States Magistrate, at the hour of 8:30 a.m. on Tuesday, May 5, 1998, in Albuquerque, New Mexico.


A P P E A R A N C E S


For the Petitioner:

        ROGER A. FINZEL, ESQ.
        Federal Public Defender's Office
        111 Lomas, Boulevard, NW, #501
        Albuquerque, New Mexico  87102


For the Respondent:

        PATRICIA A. GANDERT, ESQ.
        NM Attorney General's Office
        P.O. Drawer 1508
        Santa Fe, New Mexico  87504-1508

PAUL BACA

Professional Court Reporters, Inc.

QUALITY REPORTING AT EXCELLENT RATES!

400 Gold Ave. SW • Suite 200
Albuquerque, New Mexico 87102
Tel. (505) 843-9241 • Fax: (505) 843-9242

1          THE CLERK:  This is the matter of Andrew

2   Santillanes versus Tim Lemaster, Warden, 97 CV 549 LH/DJS.

3          THE COURT:  Please announce your

4   appearances.

5          MR. FINZEL:  On behalf of the petitioner,

6   Andrew Santillanes, Roger Finzel, Assistant Federal Public

7   Defender, appearing, Your Honor.

8          THE COURT:  Good morning.

9          MR. FINZEL:  Good morning, Your Honor.

10          MS. GANDERT:  And on behalf of the

11   respondent, Tim Lemaster, the warden in this case,

12   Patricia Gandert, Assistant Attorney General.

13          THE COURT:  Good morning, Ms. Gandert.

14          MS. GANDERT:  Good morning.

15          THE COURT:  Are you ready to proceed?

16          MR. FINZEL:  Yes, Your Honor.  I have

17   prepared a memorandum in support of the petitioner's

18   position that this is not a procedural default, or if

19   there was a procedural default, there is cause for it to

20   be excused.  And in aid of our argument this morning and

21   evidence, I'd like to file it in open court, Your Honor.

22          THE COURT:  All right.

23          MR. FINZEL:  I've given a copy to counsel

24   for the respondent, Your Honor.

25          MS. GANDERT:  Your Honor, if it please the

1   Court, respondent would like the opportunity to respond to

2   this memorandum.

3                   THE COURT:  How much time will you need?

4                   MS. GANDERT:  We could probably do it by

5   the end of the week.

6                   THE COURT:  Well, let me give you ten days.

7                   MS. GANDERT:  Thank you, Your Honor.

8                   THE COURT:  I have some interest in -- as I

9   discussed with you on the phone, both of you, when we

10  scheduled this hearing or not scheduled it, we discussed

11  what the focus of the hearing would be.  And I'm curious

12  as to whether or not either of you have found any

13  authority in state law that would adhere to federal law,

14  that is, the placement of a petition or a legal paper in a

15  prison mailbox is the filing of that document.  Who wants

16  to go first?

17                  MR. FINZEL:  Well, I rarely get to do this,

18  Your Honor, go first, so I'll go first.

19                  THE COURT:  All right.

20                  MR. FINZEL:  Your Honor, I have not found

21  any comparable rule in state court.  In fact, the

22  information I have is quite to the contrary.  I think the

23  state rule is exactly opposite the federal procedural

24  rule, as well as the constitutional basis for it.  And

25  that's addressed in our memorandum.

QUALITY REPORTING AT EXCELLENT RATES!

400 Gold Ave., SW • Suite 200
Albuquerque, New Mexico 87102
Tel. (505) 843-9241 • Fax: (505) 843-9242

Professional
Court
Reporters, Inc.

PAUL BACA

1    I believe, very briefly, that the state rule, as it

2    applies to particularly pro se petitioners, is

3    fundamentally unconstitutional in the federal standards.

4    Notwithstanding that argument for which have I have scant

5    support other than my training as a lawyer and my reading

6    of the constitution, I believe that there exists cause in

7    this case should the Court find that the Supreme Court of

8    the state of New Mexico found a procedural default.

9    I believe cause clearly exists as provided in the

10    affidavits, the affidavit provided by the respondent as

11    well as the one provided by the petitioner.  By way of

12    additional information, Mr. Santillanes is here.  We

13    brought him pursuant to a writ of habeas corpus.  He is

14    prepared and will testify to his mailing of the document

15    on March 19th, 1997, which would certainly have made it

16    sufficiently timely but for the action of someone, we

17    cannot ascertain who, in delaying the mail until it got to

18    the Supreme Court and was filed by the Supreme Court on

19    April 1st, a totally inexplicable period of time.

20    Likewise, the government has provided in their

21    affidavits that there was a lockdown that prevented Mr.

22    Santillanes from getting to the law library until March

23    5.  So that we have a delay at the beginning, and an

24    inexplicable delay in receipt by the Supreme Court.

25    THE COURT:  It was due the --

1          MS. GANDERT:  The 24th.

2          THE COURT:  -- the 24th.  So the lockdown

3    took how much of his time?

4          MS. GANDERT:  It took from the 24th through

5    the 5th, or to the 5th, I believe it is.  So that's a

6    period of eight or nine days, Your Honor, at the front end

7    of the thirty-day requirement.  And even at that, it was

8    filed -- he put it in the mail on the 19th.

9          THE COURT:  Give me some reference to that

10    document, the petition that was put in the mail, so I can

11    look at it while you're talking.  Well, let's see.  It's

12    Exhibit G.

13          MR. FINZEL:  Now I can't find it, Your

14    Honor.

15          MS. GANDERT:  It's the last page of the

16    answer, Your Honor.

17          THE COURT:  It's in the Answer.  It's

18    Exhibit N, Mr. Finzel.

19          MR. FINZEL:  Thank you, Your Honor.

20          THE COURT:  Well, anyway, the reason I

21    wanted to look at it is, why does one need the law library

22    to prepare this document?  There are no legal citations in

23    it.

24          MR. FINZEL:  Your Honor, Mr. Santillanes is

25    unlearned in law.  After the lock -- after he was --

400 Gold Ave., SW • Suite 200
Albuquerque, New Mexico 87102
Tel. (505) 843-9241 • Fax: (505) 843-9242
QUALITY REPORTING AT EXCELLENT RATES!

Professional
Court
Reporters, Inc.

PAUL BACA

1            THE COURT:  Well, you know, I don't want to

2   sound flippant, but walking through the law library won't

3   make him learned in it.

4            MR. FINZEL:  No, sir.

5            THE COURT:  If he doesn't need a law book

6   to prepare this document, why does he have to go to the

7   law library?

8            MR. FINZEL:  Because that's where he was

9   able to meet Mr. Chapel, who assisted him in the

10   preparation of this document.  Mr. Chapel is what we call

11   a jailhouse lawyer, and --

12            THE COURT:  And in the Marine Corps, we

13   called them bunkhouse lawyers.

14            MR. FINZEL:  Yes, sir.  And with regard to

15   that, Mr. Santillanes relied on his advice and assistance

16   both in the preparation of the document, which he'll

17   testify to, and to act as a further witness in terms of

18   making sure that he could prove when the document was

19   mailed.

20      We prepared the affidavit after a discussion with

21   Mr. Chapel, and we will be providing a supplemental

22   affidavit to expand on this, because Mr. Chapel has had a

23   lot of experience with the filing of pleadings and then

24   later having respondents claim that they weren't filed and

25   they weren't filed timely.

1    So he'd go through a regular ritual, which he would

2    expand on in great detail beyond what is in the

3    affidavit.  But what Mr. Santillanes is prepared to

4    testify here to today, and that is, as a regular routine,

5    he meets his clients, as it were, in the library.  It's a

6    convenient place for them to meet where they can sit down

7    together at a desk and write out the petition.

8    He can assist them in making sure the issues are

9    raised properly.  It's not a question of legal argument.

10   It's a place to meet and, if they need to look at any

11   books, to make sure that the petition is prepared with all

12   the correct pleadings laid out in it, so he doesn't miss

13   any issues.

14   Afterward, Mr. Chapel witnesses, watches him date

15   it.  They take it to the guard and show it to the guard,

16   "See, Guard?  This is the date, today's date.  This is

17   March 19th."  The guard says, "Yeah, I've seen this

18   before.  You do this every time."  And then they fold it

19   up and Mr. Chapel watches him put it in the mailbox on

20   that date just to make sure that there are no problems in

21   the future as have developed actually in this case.

22           THE COURT:  Now, is Mr. Chapel assigned to

23   the prison library even in a lockdown?

24           MR. FINZEL:  No.  Mr. Chapel is locked down

25   like everyone else.  Mr. Chapel is just another inmate who

400 Gold Ave., SW • Suite 200
Albuquerque, New Mexico 87102
Tel. (505) 843-9241 • Fax: (505) 843-9242
QUALITY REPORTING AT EXCELLENT RATES!

Professional
Court
Reporters, Inc.

PAUL BACA

8

400 Gold Ave.. SW • Suite 200
Albuquerque, New Mexico 87102
Tel. (505) 843-9241 • Fax: (505) 843-9242
QUALITY REPORTING AT EXCELLENT RATES!

Professional
Court
Reporters, Inc.

PAUL BACA

1    has tried to assist other inmates and is hired by the

2    inmates to assist them in the preparation of their

3    petitions for writ of habeas corpus.

4              THE COURT:  Well, are you suggesting that

5    there is a constitutional right in a habeas review to a

6    jailhouse lawyer?

7              MR. FINZEL:  No.  I would think there would

8    be a constitutional right to a lawyer before that, but I'm

9    the only one who thinks that.  And given these

10   circumstances, petitioners both at the state level and at

11   the federal level have to fill out these petitions

12   themselves.  And they -- they're not learned in law.  Some

13   of them don't even write very well, and they want to get

14   someone in there who can help them and make sure they do

15   it right.

16        So they seek the assistance of people who have made

17   themselves available in the jail as jailhouse lawyers to

18   assist them in the preparation of this petition.  And the

19   place for them to meet to do that is the law library.  You

20   can't very well do it in your cell.  I'm not even sure

21   that would be permitted, but that's where they meet.  It's

22   also the most convenient place for the mailbox.  The

23   mailbox is right outside the law library at the jail -- at

24   the prison, rather, in this particular facility.

25              THE COURT:  Well, let's go back to this

1   state rule that you say is essentially contrary to federal

2   law, that the placement in the mail is a filing.

3                    MS. GANDERT:  Your Honor?

4                    THE COURT:  Ms. Gandert.

5                    MS. GANDERT:  If I may address that.  This

6   Court specifically asked whether the federal rule which

7   allows filing to be in a prison mail, if that is federal

8   constitutional law, or how is it written in practice and

9   procedure.  And the state would rely on the Tenth Circuit

10  case of Jenkins v. Burtzloff.  The cite to that is 69 F.3d

11  460.

12                   THE COURT:  69 or 59?

13                   MS. GANDERT:  69.  Your Honor, I made a

14  copy of the case for the Court's benefit.  I don't know if

15  you would like it now.

16                   THE COURT:  Well, you can hand it up.

17                   MS. GANDERT:  Okay.  And in that case, the

18  Tenth Circuit specifically stated, "The rationale of

19  Houston" -- and this is on page 461, referring to Houston

20  v. Lack -- "was not constitutional or equitable in nature;

21  rather, it was based on an interpretation of the word

22  'filed' in the rule and statute governing the timeliness

23  of notices of appeal."

24       So respondent would rely on that and say that what

25  Houston v. Lack did was rely on -- I mean what Houston v.

400 Gold Ave., SW • Suite 200
Albuquerque, New Mexico 87102
Tel. (505) 843-9241 • Fax: (505) 843-9242

QUALITY REPORTING AT EXCELLENT RATES!

Professional
Court
Reporters, Inc.

PAUL BACA

1    Lack is is really an interpretation of federal law which

2    really has no effect on state law.

3        And as to the second issue that the Court wanted

4    addressed, whether the clerk was delegated the authority

5    to enter orders, Your Honor, New Mexico has a -- the

6    Supreme Court has adopted a rule which specifically

7    provides as one of the duties of the Clerk of the Court,

8    and this is -- I've also made a copy for the Court here,

9    which specifically states, "Documents not complying with

10   rules.  It shall be the duty of the clerk to enforce the

11   several requirements of these rules by refusing to file

12   documents not complying therewith."

13       So it's Respondent's contention, therefore, that the

14   rationale of Houston v. Lack is neither constitutional nor

15   equitable.  It is merely an interpretation of a federal

16   rule, and New Mexico has their own rules with regard to

17   practice and procedure, which we believe this Court should

18   approve.

19              THE COURT:  Now, is there anything

20   specific, though, on the matter of placing something in a

21   mailbox in the prison?

22              MS. GANDERT:  In New Mexico law?  No, Your

23   Honor, not as far as I can find.

24              MR. FINZEL:  Your Honor, in our memorandum

25   under SCRA, Supreme Court Rules of Appeal, 12-501(b), the

1    rule is that a certiorari petition shall be filed with the

2    Supreme Court within thirty days.  That is the rule.

3    However, in researching the rule, I believe we have some

4    argument in there as well that that is not universally

5    followed by the Supreme Court.

6        If, for example, someone has a lawyer and they're

7    late on the petition and they know they're late, then the

8    lawyer will file with the Supreme Court a petition to

9    allow leave to file a petition for writ of certiorari

10   outside the rules.  And those have been granted in the

11   past, Your Honor, by the Supreme Court.

12       Unfortunately, pro se litigants don't have that

13   opportunity.  But more importantly, this pro se litigant

14   had no idea that his document would not be received in a

15   timely fashion and no reason to believe it would not be

16   received in a timely fashion.

17       Furthermore, just to look at the case of Jenkins v.

18   Burtzloff, which Ms. Gandert has brought to the Court's

19   attention in discussing Houston v. Lack, first of all, the

20   Jenkins case talks about the delay in the receipt of the

21   mail by the prisoner, thereby delaying his activity.  And

22   the Tenth Circuit notes that there is a conflict in the

23   circuits on this issue.

24       I believe that the Third Circuit takes the proper

25   position and that the Tenth in Ms. Jenkins' case is wrong

1  under the concepts and the principles of <u>Houston v. Lack</u>

2  and the Constitution of the United States as guaranteed by

3  the Fifth Amendment.  So I think that the issue is there.

4  Certainly, Jenkins talks about what the Tenth Circuit has

5  done on the front end of the issue, but I don't think they

6  are correct, Your Honor.

7         THE COURT:  Now, you say that you have some

8  testimony that you want to present through Mr.

9  Santillanes; is that right?

10         MR. FINZEL:  Yes, Your Honor.  We've

11  provided the Court with the affidavit.  Mr. Santillanes is

12  here.  He is the one who prepared the petition, and I

13  would like to have him testify for the Court for the

14  record and for purposes of making a decision about cause

15  in this issue as to his diligent efforts to file his

16  petition in a timely fashion.  I'm prepared to do that

17  now.

18         THE COURT:  Well, I'll be happy to hear it,

19  but it seems to me like that if you can show -- well,

20  perhaps you have abandoned that.  Go ahead.

21         MR. FINZEL:  I'll listen to what you have

22  to say, Your Honor.

23         THE COURT:  Well, it seems to me that if

24  you can make a showing or are able to convince me that he

25  placed this petition in the mail and you can prove that,

1    then there is no need to analyze this in terms of cause

2    and prejudice because then we just go to the merits.

3            MR. FINZEL:  Your Honor, I believe that

4    what I was prepared to do today was to argue that placing

5    it in the mail under these circumstances is sufficient.

6    And notwitstanding that, we're prepared to show there was

7    cause for the delay; and if need be, in the future, will

8    be prepared to show in greater detail the prejudice.  So

9    I'm prepared to address the cause and let Mr. Santillanes

10   testify to that.

11           THE COURT:  Go ahead.  Do you have any

12   objection to that procedure Ms. Gandert?

13           MS. GANDERT:  No, Your Honor.

14           THE COURT:  All right.

15           THE COURT:  Step forward and be sworn.

16           MR. FINZEL:  Your Honor, the petition for

17   certiorari that Mr. Santillanes filed is already a matter

18   of record.  Therefore, I'm not moving it as a separate

19   exhibit in this hearing.  But it's already a part of the

20   court record.

21           THE COURT:  All right.

22                  ANDREW SANTILLANES

23       The Petitioner, called as a witness on his own

24       behalf, after having been first duly sworn

25       under oath, was questioned and testified as

follows:

<u>DIRECT EXAMINATION</u>

BY MR. FINZEL:

Q    Mr. Santillanes, would you please state your name and your position or your status in this case?

A    Andrew Santillanes, and...

Q    You're the petitioner, right?

A    I'm the petitioner.

Q    Now, Mr. Santillanes, drawing your attention back to February of 1997, did there come a time when you that learned Judge Smith, I believe it was, had denied your writ of habeas corpus and that it was time for you to take another proceeding?

A    Yes.

Q    When did you learn that?

A    I can't recall the date, but -- I don't know the date.

Q    Well, is it -- going back to January, February and March of 1997, were there times when the prison was in a lockdown?

A    Yes, we were constantly locked down.

Q    And was it during a lockdown that you received the documents from Judge Smith?

A    Yes, it was.

Q    And were you able to seek the assistance of

1    anyone in preparing your petition for writ of certiorari

2    to the New Mexico Supreme Court immediately?

3         A     No.  I had to wait till after the lockdown so I

4    could talk with the paralegal.

5         Q     And prior to that meeting with the paralegal,

6    did you feel confident or comfortable or did you know what

7    legal steps you next needed to take with the state of New

8    Mexico?

9         A     I felt confident that we could get this done in

10   time, get it mailed out and have everything done and

11   ready.

12        Q     Why did you seek the assistance of -- who did

13   you seek the assistance of?

14        A     Robert Chapel.

15        Q     And why did you seek his assistance?

16        A     Well, I'm not too familiar with the law, so I

17   had him help me out.

18        Q     And where did you meet with him?

19        A     The law library.

20        Q     And why did you meet with him at the law

21   library?

22        A     That's really the only place we could meet.  We

23   lived in separate dorms -- in cellblocks.

24        Q     Where did you live?

25        A     I lived in CB-5, and he lived in CB-1.

400 Gold Ave., SW • Suite 200
Albuquerque, New Mexico 87102
Tel. (505) 843-9241 • Fax: (505) 843-9242
QUALITY REPORTING AT EXCELLENT RATES!

Professional
Court
Reporters, Inc.

PAUL BACA

1    Q    And in order to contact him to arrange for the

2    meeting, could you do that -- how were you able to do

3    that?  Do you have to do that in person or do you have

4    phones between the blocks?

5    A    No, we have to do it in person.

6    Q    Could you do it during a lockdown?

7    A    No.

8    Q    So you were only able to do it after the

9    lockdown ended for you and for him?

10   A    Right.

11   Q    Now, an affidavit has been prepared and filed

12   with the Court indicating that the lockdown lasted for

13   you, at least, until March 5?

14   A    Right.

15   Q    Is that consistent with your best recollection?

16   A    It's hard to say because we were constantly in

17   lockdown for one reason or the other.  There were times we

18   were locked down for two or three days; there were times

19   we were locked down for a week or two.

20   Q    And these lockdowns were different for different

21   people, right?

22   A    Right.

23   Q    But eventually you did meet with Mr. Chappelle.

24   Chapel, I'm sorry.

25            THE COURT:  It's misspelled in the

1    affidavit.

2              MR. FINZEL:  I think he signed it

3    correctly, Your Honor.

4              THE COURT:  Yes.

5              MR. FINZEL:  Yes, it is misspelled in the

6    affidavit, and I'm misstating it here in court, so Mr.

7    Chapel.

8         Q    (By Mr. Finzel)  After you met Mr. Chapel and

9    asked him to take care of assisting you, did you make

10   arrangements to meet him at the law library?

11        A    Yes, I did.

12        Q    Could you have met with him in his cell?

13        A    No.

14        Q    Why not?

15        A    We lived in separate cell -- I mean in separate

16   blocks, and we're not allowed to go from one block the

17   another.

18        Q    So you couldn't go to his cellblock and he

19   couldn't go to your cellblock?

20        A    No, we couldn't.

21        Q    So where did you meet him?

22        A    We had to meet at the law library.

23        Q    Before that, where did you meet him?

24        A    In the law library.

25        Q    Well, in terms of when you first met him -- he's

1    in another cellblock?

2         A    Right.

3         Q    You knew Mr. Chapel before that date; is that

4    correct?

5         A    Yes, sir.

6         Q    How did you tell him?  Did you meet him in the

7    yard?

8         A    Oh, in the chow hall.

9         Q    In the chow hall?

10        A    Right.

11        Q    So all the cellblocks eat together, and that's

12   where you met him?

13        A    That's right.

14        Q    And could you have prepared the petition in the

15   chow hall?

16        A    No.

17        Q    That's not allowed?

18        A    No.

19        Q    You're only allowed to eat there?

20        A    Yes, that's all.

21        Q    You eat there and visit for moment and then

22   leave?

23        A    That's right.  We have twenty minutes to eat and

24   leave.

25        Q    You have twenty minutes to eat and leave?

1    A    Correct.

2    Q    So in that twenty-minute period, at some point

3  you asked him to meet you at the law library?

4    A    Right.

5    Q    And when you met him at the law library, that's

6  where they have tables where you can sit together and

7  prepare it together?

8    A    Right.

9    Q    And he helped you in the preparation of it?

10   A    Yes, he did.

11   Q    Now, the document is dated March 19th, 1997?

12   A    Right.

13   Q    Is that the day you prepared it?

14   A    That's the day we mailed it out.  I signed it

15  and mailed it out.

16   Q    Did you work on it more than one day, or did you

17  just meet one time and prepare it and mail it out?

18   A    We -- he worked on it.  I met with him two or

19  three times.

20   Q    Now, the document itself is pretty simple?

21   A    Correct.

22   Q    Why did you meet with him two or three times?

23  What did you --

24   A    He wanted to discuss it with me, what he was

25  doing and what he was putting down.

20

1    Q    But you had to bring all the rest of your files

2    and have him review everything before he prepared it?

3    A    Right.

4    Q    And he told you he needed to look at everything,

5    didn't he?

6    A    Yes, he did.

7    Q    So you met with him two or three times before

8    this particular document was actually prepared?

9    A    Right.

10    Q    And when you prepared it, what did you do after

11    you signed it and dated it?  What were the next steps that

12    you did?

13    A    Well, I put it in an envelope and walked over to

14    CO Andy --

15    Q    That's Corrections Officer Andy Ray?

16    A    Andy Ray.  He watches the library.  He is

17    security of the library.  And Robert Chapel showed him

18    what it was, asked him to witness the mailing, explained

19    to him what it was.  And as he did that, he handed it over

20    to me and I dropped it in the mailbox.  The CO says, okay,

21    he saw.

22    Q    Did Mr. Chapel explain to you why he did it in

23    that way?

24    A    He's always told me that there have been other

25    times that mail has got lost or was delayed for one reason

1    or the other.  So he has always made it a habit, not just

2    with me, but with everyone else he helps out.

3        Q    In terms of Mr. Chapel's help, did he check the

4    rules to see if you had any problem with timeliness in

5    filing the petition?  Was he worried about it being filed

6    timely?

7        A    No.  He was confident it was going to be there

8    on time.

9        Q    But he did check the rules, then?

10       A    Yes.  He is the type that will double-check

11   everything.

12       Q    And when you mailed it, did you have any concern

13   that it wouldn't get to the Supreme Court in time?

14       A    No, I didn't.

15       Q    If you had had any concern, would you have taken

16   other steps or would you have talked to Mr. Chapel about

17   it?

18       A    Yes.  I would have talked to Mr. Chapel and

19   tried to figure something else out.

20            MR. FINZEL:  I have no further questions,

21   Your Honor.

22            THE COURT:  Ms. Gandert?

23            CROSS-EXAMINATION

24   BY MS. GANDERT:

25       Q    Mr. Santillanes, what did you do when you

22

1    received the letter from the Supreme Court?

2        A    Well, I took it to Chapel.

3        Q    And did you do anything after that?

4        A    Well, he filed -- well, he filed -- I forgot

5    what he filed.  He filed something.  I just can't remember

6    what he filed.

7        Q    With the New Mexico Supreme Court?

8        A    Right.  He filed it to the New Mexico Supreme

9    Court.  I just can't remember what it was he filed.  He

10   explained it to me, but at that time we were -- you know,

11   it was just like a real quick thing because, you know,

12   most of the time they don't give us that much time.

13        They had a -- after lockdowns, they would have like

14   a controlled movement, and they only let certain blocks go

15   to the library.  It was real hard for us to meet at times.

16        Q    Do you have a copy of what Mr. Chapel sent to

17   the Supreme Court?

18        A    Not with me, no.

19        Q    Would it be possible for you to get a copy of

20   it?

21        A    If I go back to the penitentiary.  All my

22   paperwork is back in my cell.

23             MS. GANDERT:  That's all, Your Honor.

24             THE COURT:  Mr. Santillanes, how much

25   education do you have?

1    THE WITNESS:  I don't have very many --
2    very much.

3    THE COURT:  How much?

4    THE WITNESS:  I don't have very much.

5    THE COURT:  Well, how far did you go in
6    school?

7    THE WITNESS:  Right now they have me at a
8    fifth-grade education.

9    THE COURT:  And before you went to prison,
10   how many years of schooling did you participate in?

11   THE WITNESS:  Not very many.

12   THE COURT:  Do you know how much "not very
13   many" means?  Did you go to the sixth grade, seventh
14   grade, high school or where?

15   THE WITNESS:  Well, I made it to high
16   school, but you know, I didn't stick around too long.

17   THE COURT:  How many years were you in high
18   school?

19   THE WITNESS:  About one year.

20   THE COURT:  Where?

21   THE WITNESS:  Rio Grande.

22   THE COURT:  How old are you?

23   THE WITNESS:  Forty.

24   THE COURT:  How much education has Chapel
25   got?

1          THE WITNESS:  He's got some college.

2          THE COURT:  He went through college?

3          THE WITNESS:  Correct.

4          THE COURT:  What's he in prison for?

5          THE WITNESS:  I really don't know.  I

6  hardly ever talk to the convicts about what they're doing

7  time for unless I know them better.

8          THE COURT:  Well, how long has he been

9  there?

10          THE WITNESS:  He's been there, I guess, six

11  or seven years.

12          THE COURT:  And how long have you been in

13  prison?

14          THE WITNESS:  Fourteen.

15          THE COURT:  How much did you pay Mr.

16  Chapel?

17          THE WITNESS:  Well, he really used to just

18  charge me like a carton of smokes every other week.

19          THE COURT:  Did you pay him up front?

20          THE WITNESS:  Whenever I could.  You know,

21  there the jobs don't pay very much, so I would pay him

22  what I could.

23          THE COURT:  Well, did you pay him any money

24  besides the smokes?

25          THE WITNESS:  No.

1    THE COURT:  Do you owe him any money for

2    this legal work that he did for you?

3    THE WITNESS:  No, I don't.

4    THE COURT:  And your recollection is you

5    gave him only a carton of cigarettes?

6    THE WITNESS:  No, I've given him more than

7    that.  I've given him like food tokens, because they had a

8    store where you could -- like a canteen.  And once in a

9    while I'd give him $5 in tokens or $10 in tokens,

10    cigarettes.  I've always asked him if he needed anything

11    for helping me out.  He never really charged me.  He just --

12    I've offered it because I appreciated what he was doing

13    for me, because I couldn't do it on my own.

14    THE COURT:  But other people use him; is

15    that right?

16    THE WITNESS:  Yes.  He helps a lot of

17    people out.

18    THE COURT:  And of course, everybody gives

19    him a little something for the help?

20    THE WITNESS:  Well, some do, some don't.

21    Some can afford it, some can't.

22    THE COURT:  On the petition for certiorari,

23    is the handwriting yours or Mr. Chapel's?

24    THE WITNESS:  That's mine.

25    THE COURT:  That's your handwriting?

1          THE WITNESS:  Yes.

2          THE COURT:  What did he do for you?

3          THE WITNESS:  Well, he typed out the

4 paperwork.  He did all the legal work.  The handwriting

5 that's there is my initials.

6          THE COURT:  Well, you know the petition --

7 did you read it?

8          THE WITNESS:  He explained it to me.

9          THE COURT:  Well, the reason that it was

10 late in getting to the Supreme Court is because it was

11 directed to the Court of Appeals; isn't that true?

12          THE WITNESS:  The Court of Appeals?

13          THE COURT:  Yes.

14          THE WITNESS:  I don't believe so.

15          THE COURT:  Well, take a look at the

16 petition.  It's Exhibit P to the state's answer and not

17 Exhibit N, as I recall.  It's not reflected in the index

18 in the -- it's not Exhibit P.  It's not even reflected in

19 the index.  It's the document after Exhibit P.  Show it to

20 Mr. Santillanes, if you will.

21          MS. GANDERT:  Actually, the heading on top

22 is in The Supreme Court, but the type here is to the New

23 Mexico Court of Appeals.

24          MR. FINZEL:  I'll hand it to him.

25          THE COURT:  Is that your handwriting, Mr.

400 Gold Ave., SW • Suite 200
Albuquerque, New Mexico 87102
Tel. (505) 843-9241 • Fax: (505) 843-9242
QUALITY REPORTING AT EXCELLENT RATES!

Professional
Court
Reporters, Inc.

PAUL BACA

1      Santillanes?

2                      THE WITNESS:  Oh, here?  No.

3                      THE COURT:  You know, there is some typed

4      stuff and then there is some handwriting.  Is that yours

5      or Mr. Chapel's?

6                      THE WITNESS:  No, that's Mr. Chapel's.

7                      THE COURT:  Okay, so he wrote that out.

8      Now, as Ms. Gandert points out, underneath the tabs, the

9      document is entitled "In the Supreme Court of the State of

10     New Mexico."

11                     THE WITNESS:  Right.

12                     THE COURT:  But the document, the petition,

13     is directed to the New Mexico Court of Appeals.

14                     THE WITNESS:  Right.

15                     THE COURT:  Well, to whom did you mail it?

16                     THE WITNESS:  To the Supreme Court.

17                     THE COURT:  How do you know?

18                     THE WITNESS:  Because that's what the

19     envelope said.  That's what was typed on the envelope.

20                     THE COURT:  You can't remember the date,

21     but you can remember what was typed on an envelope?

22                     THE WITNESS:  I remember the date it was

23     sent out.  I signed it, and Mr. Chapel handed me the

24     envelop.

25                     THE COURT:  Do either of you have any

400 Gold Ave., SW • Suite 200
Albuquerque, New Mexico 87102
Tel. (505) 843-9241 • Fax: (505) 843-9242

QUALITY REPORTING AT EXCELLENT RATES!

Professional
Court
Reporters, Inc.

PAUL BACA

1    questions in light of what I've asked Mr. Santillanes?

2              MR. FINZEL:  Your Honor, I believe the

3    caption is correct.

4              THE COURT:  Well --

5              MR. FINZEL:  The petition for writ of

6    certiorari goes to the Supreme Court, but it's a request

7    for the Supreme Court to issue an order to the Court of

8    Appeals.

9              THE COURT:  Well, this hadn't gone to the

10   Court of Appeals.

11             MS. GANDERT:  Actually, that's not correct.

12             THE COURT:  I'm fairly certain it's not

13   correct, because the petition for cert was based on a

14   ruling by Judge Smith, not the Court of Appeals, so it

15   wasn't a petition of certiorari to the Court of Appeals.

16             MR. FINZEL:  I think that if it had been an

17   order from the Court of Appeals, it would be the way in

18   which I've seen the pleadings prepared before.  The

19   question presented for review is correctly stated, Your

20   Honor.  And in terms of where it was mailed -- I think you

21   asked Mr. Santillanes where it was mailed, and his answer

22   was the Supreme Court.  I did not ask Mr. Chapel that

23   question.  I'll get another affidavit from him as to where

24   it was mailed.

25             THE COURT:  Well, I'd like to see him up

1    here the next time.

2          MR. FINZEL:  That's fine, Your Honor.  I

3    was prepared to do that.

4          THE COURT:  See, this raises a question in

5    my mind whether it was mailed to the right place.

6          MR. FINZEL:  Unfortunately, the Supreme

7    Court did not save the envelope, a practice which I do

8    with my correspondence, but I looked for it.  I've talked

9    to Ms. Gandert about it, and she doesn't have a copy of

10   the envelope, so we don't know.

11         MS. GANDERT:  I believe if there would be a

12   copy, that the Court would send everything back to the

13   inmate.  And if there would be a copy of the envelope, it

14   would be in the inmate's possession.

15         THE COURT:  Does the Supreme Court log its

16   mail?

17         MS. GANDERT:  Pardon?

18         THE COURT:  Does the Supreme Court log its

19   mail?

20         MS. GANDERT:  I don't know.  I can find

21   that out --

22         THE COURT:  Or does the Court of Appeals,

23   either of them?

24         MR. FINZEL:  Your Honor, I don't know what

25   the Court of Appeals does if they receive something

PAUL BACA

Professional
Court
Reporters, Inc.

400 Gold Ave., SW • Suite 200
Albuquerque, New Mexico 87102
Tel. (505) 843-9241 • Fax: (505) 843-9242

QUALITY REPORTING AT EXCELLENT RATES!

inadvertently.  I'm prepared to bring Mr. Chapel here and have him testify where he mailed it, et cetera, because it's clearly a petition for writ of certiorari to the Supreme Court.  And I'm sure, as careful as he is, he would have mailed it to the Supreme Court.  But I'll let him testify to that.

THE COURT:  Any questions you have of Mr. Santillanes?  Anything further?

MR. FINZEL:  Just one more question, Your Honor, very briefly.

REDIRECT EXAMINATION

BY MR. FINZEL:

Q    Mr. Santillanes, you knew you were filing a petition with the Supreme Court of the State of New Mexico?

A    Yes, I did.

Q    And who prepared the envelope that it was mailed in?

A    Robert Chapel.

Q    Did you check to see if it was properly addressed?

A    Yes, I did.

Q    Was it properly addressed to the Supreme Court, to the best of your recollection?

A    Yes, it was.

1    Q    If it had been addressed to the New Mexico Court

2    of Appeals, would you have asked him about it?

3    A    Yes, I would have.

4         MR. FINZEL:  Nothing further, Your Honor.

5         THE COURT:  Ms. Gandert?

6         MS. GANDERT:  I have no further questions,

7    Your Honor.

8         THE COURT:  Is there anything else that you

9    want to present today?

10        MR. FINZEL:  Not at this time, Your Honor.

11   I'm prepared to bring in the corrections officer and Mr.

12   Chapel, bring them here and have them testify, Your Honor.

13        THE COURT:  I think, because of the

14   importance of that threshold question, I'd like to hear

15   that testimony.

16        MR. FINZEL:  My apologies to the Court that

17   I didn't notice that in the petition to begin with;

18   otherwise, I would have had them here to begin with.  With

19   regard to the corrections officer, my investigator

20   attempted to reach him by telephone to get an affidavit

21   from him but was unsuccessful.  As is my usual practice,

22   I'll simply subpoena him here.

23        THE COURT:  All right.  I have one further

24   directive to Ms. Gandert --

25        MR. FINZEL:  May Mr. Santillanes resume his

400 Gold Ave., SW • Suite 200
Albuquerque, New Mexico 87102
Tel. (505) 843-9241 • Fax: (505) 843-9242

QUALITY REPORTING AT EXCELLENT RATES!

Professional
Court
Reporters, Inc.

PAUL BACA

chair, Your Honor?

THE COURT:  Sure.  Thank you very much.
I'll ask you to investigate the forms that are maintained
in the prison library, whether or not they are
pre-prepared forms.

MR. FINZEL:  Your Honor, I can -- just to
supplement the record, I can put Mr. Santillanes on to
answer that question in terms of what he knows.

THE COURT:  Well, I'll wait to hear from
Mr. Chapel to see what -- anything else that we should
take up today?  As I said, you have ten days to respond to
the memorandum.  When I find time, I'll reschedule this
matter.  It will be on short notice, subject, of course,
to the Marshal's abilities to bring Mr. Chapel to the
courthouse.

The shortness of when that next hearing or the time
interval will depend on how difficult it is for someone,
not necessarily the Marshal, to bring the prisoner here.

MS. GANDERT:  Excuse me, Your Honor.  I do
have one more thing.  During the telephonic conference, I
did mention that I would bring a copy of the prison
correspondence regulations.  Would you like that?

THE COURT:  Yes.  And all of the matters
that you have handed me, of course, the memorandum will be
filed; and let's see, you gave me a case -- and the New

1   Mexico Rules Annotated will be made part of the record

2   that Ms. Gandert handed up.  I assume there is no

3   objection?

4              MR. FINZEL:  No objection, Your Honor.

5              MS. GANDERT:  I was going to say, I already

6   sent a copy to Roger.

7              THE COURT:  And Exhibit A, which are

8   regulations dealing with mail at the New Mexico

9   penitentiary, will be made part of the record.  Do you

10  object to that Mr. Finzel?

11             MR. FINZEL:  No objection, Your Honor.

12             THE COURT:  All right.  If there is nothing

13  else, we'll be in recess.

14             (Court adjourned at 9:07 a.m.)

15

16

17

18

19

20

21

22

23

24

25

### REPORTER'S CERTIFICATE

I, DEBRA ANN FRIETZE, a court reporter for the United States, do hereby certify that I reported the foregoing case in stenographic shorthand and transcribed, or had the same transcribed under my supervision and direction, the foregoing matter and that the same is a true and correct record of the proceedings had at the time and place.

I FURTHER CERTIFY that I am neither employed by nor related to any of the parties or attorneys in this case, and that I have no interest whatsoever in the final disposition of this case in any court.

WITNESS MY HAND this 6th day of May, 1998.

Debra Ann Frietze, CCR #251
Certified Court Reporter
License Expires:  12/31/98