1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

FILED
UNITED STATES DISTRICT COUR
OF NEW MEXICO
99 APR 21 AM 8: 37

No. 97-CV-549

ANDREW MICHAEL SANTILLANES,

        Plaintiff,

vs.

TIM LEMASTER, Warden,

        Defendant.

                TRANSCRIPT OF PROCEEDINGS
                Tuesday, April 6, 1999
                9:00 a.m.
                Habeas Corpus

Before the HONORABLE DON J. SVET,
Magistrate Judge of the UNITED STATES DISTRICT COURT,
for the District of New Mexico.

             A P P E A R A N C E S

For the Petitioner:

    ANN STEINMETZ
    Federal Public Defender
    111 Lomas Blvd., NW, Suite 501
    Albuquerque, NM 87102
    BY:  MR. ROGER FINZEL
         Assistant Federal Public Defender

For the Respondent:

    PATRICIA MADRID
    New Mexico State Attorney General
    PO Drawer 1508
    Santa Fe, NM  87504-1508
    BY:  MS. PATRICIA GANDERT
         Assistant Attorney General

QUALITY REPORTING AT EXCELLENT RATES!
400 Gold Ave., SW • Suite 200
Albuquerque, New Mexico 87102
Tel. (505) 843-9241 • Fax: (505) 843-9242

Professional
Court
Reporters, Inc.

PAUL BACA

2

INDEX TO TRANSCRIPT OF PROCEEDINGS

Page

TRANSCRIPT OF PROCEEDINGS                                    3

WITNESSES

Called by The Petitioner:

  ANDREW MICHAEL SANTILLANES

Direct Examination by Mr. Finzel                             3
Cross-examination by Ms. Gandert                           38

  JOSEPH RIGGS III

Direct Examination by Mr. Finzel                           42
Cross-examination by Ms. Gandert                           57

Called by the Respondent:

  MICHAEL COX

Direct Examination by Ms. Gandert                          58
Cross-examination by Mr. Finzel                            60
Examination by The Court                                   62
Further cross-examination by Mr. Finzel                    63

REPORTER'S CERTIFICATE (Hilland)                           69

400 Gold Ave., SW • Suite 200
Albuquerque, New Mexico 87102
Tel. (505) 843-9241 • Fax: (505) 843-9242
QUALITY REPORTING AT EXCELLENT RATES!

Professional
Court
Reporters, Inc.

PAUL BACA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

3

TRANSCRIPT OF PROCEEDINGS

(NOTE:  In open court)

THE CLERK:   This is the matter of Andrew Santillanes v. Tim LeMaster, 97-CV-547 LH/DJS.

THE COURT:   Please announce your appearances?

MR. FINZEL:   Roger Finzel on behalf of the Petitioner Andrew Santillanes who is now present in the courtroom, Your Honor.

MS. GANDERT:   Patricia Gandert, Assistant Attorney General, for the Warden Tim LeMaster.

THE COURT:   Marshall, where has Mr. Santillanes been?

U.S. MARSHALL:   He's been at the Wackenhurst prison down in Hobbs, New Mexico.

WACKEHHUT GUARD:   Wackenhut.

THE COURT:   Well, I meant this morning, not yesterday.

U.S. MARSHALL:   He came in before I got here, and I got here a little after 8:00.  And there were some problems with restraints and other things.  And her partner is currently downstairs getting his legal paper out of the van.  So I'm sitting in until he gets up here.

THE COURT:   Well, was there some difficulty in them getting into the building or what?

4

1          U.S. MARSHALL:   I got in after 8:00, Your

2    Honor.  I'm not exactly certain what occurred.  I just

3    wanted to speed it up so I ran him up myself.

4          THE COURT:   What time did you get here

5    with the prisoner?

6          WACKENHUT GUARD:   6:00.

7          THE COURT:   Stand up when you talk to me.

8          WACKENHUT GUARD:   6:00 a.m.

9          THE COURT:   You've been here since 6:00?

10         WACKENHUT GUARD:   Yes, sir.

11         THE COURT:   And nobody to tell you where

12   this hearing was?

13         WACKENHUT GUARD:   We been -- we had him

14   placed in a holding cell downstairs.  And I'm not sure.

15   I'm not familiar with your courthouse.

16         THE COURT:   Well, I'll investigate it with

17   the Marshall.  And I will ask you to report to me the

18   circumstances of your investigation.

19         A copy of the writ went to the prison Marshal,

20   did it not?

21         MR. FINZEL:   That's what I'm informed by

22   the clerk of the court.  They sent a copy to the Marshall

23   Service, Your Honor.  That was on Friday also.

24         THE COURT:   Well, it seems like one hand

25   doesn't know what the other is doing.  But it's not your

PAUL BACA

Professional
Court
Reporters, Inc.

QUALITY REPORTING AT EXCELLENT RATES!

400 Gold Ave., SW • Suite 200
Albuquerque, New Mexico 87102
Tel. (505) 843-9241 • Fax: (505) 843-9242

5

1  fault.  You're just the deputy that's sent up here.  But

2  I see enough hiding behind regulations to cause anybody to

3  wonder about the bureaucracy.  But I want a report on why

4  you couldn't have him up here, if he's in one of your

5  holding cells, at 8:30 in the morning.

6             U.S. MARSHALL:    Yes, sir.

7             THE COURT:    Thank you very much.  Be

8  seated.

9         Are you ready to proceed, Mr. Finzel?

10             MR. FINZEL:    Yes, Your Honor, we're ready

11 to proceed.

12             THE COURT:    Call all your witnesses and

13 have them sworn.

14             MR. FINZEL:    Mr. Riggs, Mr. Santillanes.

15 The Government has a witness, Your Honor.  Do you want to

16 swear him at the same time?

17             THE COURT:    Where is that witness?  I want

18 them all sworn.

19             MR. FINZEL:    He's in the witness room.

20 Michael Cox.

21             MS. GANDERT:    I'll get him.

22             MR. FINZEL:    It's the Government's

23 witness, or the respondent's witness, Your Honor.

24         (Whereupon, three witnesses were duly sworn)

25             THE COURT:    All right.  Is the rule being

6

1    invoked?

2              MR. FINZEL:   No, Your Honor.

3              THE COURT:   All right.  Please be seated.

4    Call your first witness.

5              MR. FINZEL:   Andrew Santillanes.

6                    ANDREW SANTILLANES

7         (Being previously sworn, testified as follows)

8                    DIRECT EXAMINATION

9    BY MR. FINZEL:

10        Q     Mr. Santillanes, you're the petitioner in this

11   case, and you filed a writ of habeas corpus in federal

12   court.  And among the things that you have complained of,

13   you have complained that your lawyer was ineffective?

14        A     Right.

15        Q     One of the issues that you've raised is -- let's

16   go back a minute.  This matter came up I believe in 1985,

17   you were charged with murder?

18        A     Yes.

19        Q     And at the time that you went to trial, did your

20   lawyer have an opportunity to talk to you about whether or

21   not you should or could testify?

22        A     Yes, he did.

23        Q     And what did your tell your lawyer about

24   testifying?

25        A     I told him I would like to testify on my behalf.

7

Q    And in fact did you testify in that case?

A    No, I didn't.

Q    Why not?

A    My attorney felt that it wasn't necessary for me to get on the stand.  It wasn't in my best interests.

Q    And do you remember what the discussion was? Why it wouldn't be in your best interests?

A    He felt that he had this case pretty well beat.

Q    And why did you understand that he felt had he this case pretty well beat?

A    Well, for the simple reason that they really had no evidence of any kind.  But except for one person's testimony.

Q    And, well, he didn't keep you from testifying? He didn't prevent you from getting on the stand and testifying, did he?

A    No, he didn't.

Q    Why didn't you testify?

A    Again like I said, he said it was under -- it would be -- I can't think right now.  I'm sorry.

Q    That's okay.

A    It's been a long trip.

Q    I understand that.  But let me ask you a couple preliminary questions.  You had prior convictions for crimes, didn't you?

8

1     A     Yes, I did.

2     Q     Was one of the reasons why he didn't want you to

3     testify was because they would be able to bring up these

4     prior convictions?

5     A     Yes, it was.

6     Q     Well, what was the evidence that was against you

7     in the trial?

8     A     There was no evidence.  It was just one person

9     saying -- pointing a finger, saying I committed this

10    crime.

11    Q     And who was that person?

12    A     James Sedillo.

13    Q     And what do you recall him saying?

14    A     He said that I killed this person.

15    Q     And did he say why you killed him?

16    A     He said it was behind a robbery.

17          MS. GANDERT:    Your Honor, I would object.

18    This testimony is in the state court record.  I don't know

19    why Mr. Santillanes needs to reiterate it.

20          THE COURT:    Well, I'm going to let him

21    proceed some distance on this path so that he can come

22    around, noting that it's a long trip during the night.

23    And so he can come around to the original question of why

24    he thinks that he should have testified.

25    Q     Now, in terms of this man Mr. Sedillo who

9

1    testified against you, do you remember the conversation,

2    the advice, that your lawyer gave regarding his testimony?

3    What did you think about his testimony at the time that

4    caused you not to testify?

5        A    Well, it was all false.

6        Q    Well, was there anything to corroborate that

7    testimony?  To back it up?  Or was it just his word?

8        A    It was just his word.

9        Q    That's your recollection?

10       A    Right.  There was no evidence of any kind.  They

11   went strictly by his word.

12       Q    Now, let me back up again.  You have complained

13   in your habeas petition that Mr. Riggs did not put you on

14   the stand.  But is it your testimony today that -- well,

15   what is your testimony?  He didn't force you not to

16   testify.  Did he tell you that you could testify

17   regardless of his advice?

18       A    No, he didn't.  He just told me it was in my

19   best interests that I won't take the stand.  He figured

20   that we had a good clear case, that he can beat this case

21   without my testimony.

22       Q    And did you know that you could testify anyway

23   regardless of his advice?

24       A    I didn't really understand that at the time.  I

25   thought I really didn't have to.

10

Q    So you followed his advice basically?

A    Yes.

Q    Okay.  Now, and his advice was based on what you've already testified to, that there didn't seem to be much of a case other than the testimony of one person, right?

A    Yes, sir.

Q    Now, Mr. Santillanes, you didn't make a statement to the police when they arrested you?  You exercised your right of silence, didn't you?

A    Yes, sir, I did.

Q    And has your account of what happened ever been reported anyway?

A    No, sir.

Q    Well, then let's start at the beginning here. What happened on that night?  There was a man who died that night, wasn't there?

A    Yes, sir.

        MS. GANDERT:   Your Honor?  Your Honor, I would object to this line of questioning.

        THE COURT:   What's the grounds of your objection?

        MS. GANDERT:   The grounds of my objection is in his petition he raises two claims.  And this seems to be going to either like an insufficiency of the

11

1    evidence, which claims have never been raised in any state

2    court proceeding.  And I don't think they are appropriate

3    for this Court.

4        He certainly has not raised these in any -- or

5    his version of the events in any of the pleadings that he

6    has filed both in state court and this Court.

7        THE COURT:  Well, but doesn't he raise a

8    claim of actual innocence or fundamental miscarriage of

9    justice issue?  And doesn't this seem to go in that

10   direction?

11       Well, I'll ask Mr. Finzel.  What are you trying

12   to do here, Mr. Finzel?

13       MR. FINZEL:  There is that, Your Honor.

14   There is the claim of actual innocence which he has always

15   maintained.  And we certainly have not addressed that.

16   The only way to address that issue is to have him testify

17   to what happened that night.

18       Secondly, there is the issue of ineffective

19   assistance of counsel.  And the Court is going to have to

20   assess whether or not given the information that was known

21   to defense counsel about what Mr. Santillanes would

22   testify to whether the advice he gave met the standard

23   required under Strictland or not in terms of the advice he

24   gave.  Essentially that's what we're looking at.  And the

25   only way you can assess that is to know what he would

12

1    testify to.

2             THE COURT:    Well, perhaps if you couch it

3    in those terms, but it seems to me like you want a

4    retrial.   And that's certainly not the purpose of a habeas

5    corpus proceeding.

6             MR. FINZEL:    No, Your Honor, we're not

7    going to do a retrial, but I am eliciting his testimony of

8    what happened that night because that was known to the

9    defense attorney and in the context of the trial it grazes

10   two issues.   His testimony will raise an issue whether or

11   not that was good advice or advice that meets the standard

12   under Strictland.

13             And, secondly, whether or not we're talking

14   about actual innocence here in terms of the crime.   He was

15   convicted of felony murder, Your Honor.

16             THE COURT:    I understand that.

17             MR. FINZEL:    And it's our position that

18   there was no felony with which a murder could have been

19   tied to.   And had he so testified --

20             THE COURT:    Well, the record, I can look

21   at that and have.   I don't have to speculate, but I think

22   that one of the felonies that comes to mind right away is

23   a kidnapping, you know.   So I'm going to let you go on for

24   a while, but I -- well, go on.

25             MR. FINZEL:    I think we'll be able to --

400 Gold Ave., SW • Suite 200
Albuquerque, New Mexico 87102
Tel. (505) 843-9241 • Fax: (505) 843-9242
QUALITY REPORTING AT EXCELLENT RATES!

Professional
Court
Reporters, Inc.

PAUL BACA

13

1    with Mr. Santillanes's testimony, Your Honor, I think

2    we'll address those issues of whether or not there was a

3    felony and in terms of the evidence against him.  The

4    evidence of that was Mr. Sedillo's testimony.

5                    MS. GANDERT:    Your Honor, I would just

6    like my objection noted because this particular claim that

7    there was not a felony for the underlying felony --

8                    THE COURT:    That's a new matter, too.

9                    MS. GANDERT:    That's an entirely new

10   matter.  And federal habeas corpus are set to ensure that

11   individuals are not imprisoned in violation of the

12   Constitution, not to correct errors of fact.

13                   And in this particular case, it appears that

14   he's raising an entire set of new facts, which as I

15   previously indicated have never been raised before in this

16   or state court.

17                   (Reporter's Note:  Phone rang)

18                   THE COURT:    If you'll excuse me, that may

19   be a call from the pool call.

20                   Just a minute.

21                   (Discussion off the record)

22                   THE COURT:    We'll be in recess for five

23   minutes.

24                   (Recess taken from 9:08 a.m.

25                     to 9:12 a.m.)

14

1          THE COURT:    Go ahead, Mr. Finzel.

2          MR. FINZEL:    Thank you, Your Honor.

3      Q    Now, Mr. Santillanes, in terms of your claim of

4  actual innocence, why don't you tell us what happened that

5  night when that man died?   Start at the beginning.   You

6  were with Mr. Sedillo, right?

7      A    On December 24th, 1984, I got home from work,

8  took a shower and decided to go out, celebrate Christmas

9  Eve.   And as I was leaving my home, I ran into James

10  Sedillo, who asked what I was going to do that night.

11          I told him I was going to go out, have a few

12  beers, and enjoy the Christmas Eve.   And he asked if he

13  could come along with me.

14      Q    Who was driving?

15      A    I was.

16          THE COURT:    Well, you make an assumption

17  that they were driving.   There is no evidence in the

18  record that they were driving.   You want to establish

19  that, Mr. Finzel?

20          MR. FINZEL:    I shall, Your Honor.   I

21  shall.

22      Q    How did you travel that night?

23      A    I was driving an 84 Honda.

24      Q    And it was your car?

25      A    No.   It was the car of the company I worked for.

400 Gold Ave. SW • Suite 200
Albuquerque, New Mexico 87102
Tel. (505) 843-9241 • Fax: (505) 843-9242
QUALITY REPORTING AT EXCELLENT RATES!

Professional
Court
Reporters, Inc.

PAUL BACA

15

Q    Okay.  And what company was that?

A    Harry's Hondas.

Q    Now, where did you meet Mr. Sedillo?

A    He was my mother's neighbor.

Q    Your mother's neighbor?

A    Right.  I was over at my mother's house to take a shower after I got off work.

Q    And where is that?

A    That was at 217 60th, Northeast.

Q    In Albuquerque?

A    Northwest, I mean.

Q    In Albuquerque?

A    Correct.

Q    So you met Mr. Sedillo and you agreed -- he agreed -- he asked to go along with you.  Then what happened?

A    Well, we went for a drive.  We stopped, bought a six pack of beer.  Stopped by my brother's house, had a drink with him.

Q    Where was your brother's house?

A    It was his brother's house.  I don't know the address of the house, but it was down around the Tingley area.

Q    Tingley Beach?

A    Tingley Park.

16

Q    Tingley park?

A    Right.

Q    Just one moment.

        MR. FINZEL:    I'll proceed, Your Honor.

        THE COURT:    Go ahead.

        MR. FINZEL:    Thank you.

Q    Now, after the brother's house, what happened next with you and Mr. Sedillo?

A    We were trying to figure out where we were going to go that night.  So I decided on going to Gram Central up on Juan Tabo and Montgomery.  When we arrived at Juan Tabo and Montgomery, the Gram Central was closed.

        So we decided to stop by the speak easy, which is called The Back Door, behind the La Bamba bar on Central about a block and a half up from Louisiana.  We stopped there and we had a few beers.

Q    Did you meet anyone there?

A    Yes, we didn't meet anyone there.  It's a --

Q    I mean, did you meet anyone there that night?

A    No, I didn't.  We just had a couple of beers.

Q    And then where did you go?

A    They called last call for alcohol.  They were closing the bar down.  So everybody started leaving the bar.  And it was kind of cold that night.  So we got in the car, and we started it.  I started it up and let it

QUALITY REPORTING AT EXCELLENT RATES!

400 Gold Ave., SW • Suite 200
Albuquerque, New Mexico 87102
Tel. (505) 843-9241 • Fax: (505) 843-9242

Professional
Court
Reporters, Inc.

PAUL BACA

17

1    warm up for a little while.

2          And as we were leaving, I seen these two men

3    walking that I noticed in the bar.  And I stopped and I

4    asked them if they would like a ride home because it was

5    cold that night.  And they agreed to go.

6    Q    And where did they get into the car?

7    A    They got in the car on Central.  It was right

8    across the street from it the speak easy.

9    Q    Where in the car were they seated?

10   A    They were seated in the backseat.

11   Q    And where were you going to take them?

12   A    I was going to give them a ride home, but one of

13   the gentlemen had asked me if I could score him some weed.

14   Q    And did you know where to score weed?  That is,

15   to purchase marijuana?

16   A    Yes, I did.  I told him I could get him some,

17   but it would take a little while.  And we drove around.

18   Q    Where did you go?

19   A    We just cruised around Central.  We stopped, got

20   another six-pack of beer, and we ended up going to the

21   mesa.

22   Q    And why did you go to the mesa?

23   A    Because that's why I could get the weed at.

24   Q    On the mesa?

25   A    Right.

18

Q    Who was on the mesa?

A    There was a little deal going on back in those days, a little plane would go by, drops off a little quantity of weed before it lands at Coronado Airport.  And I had ties with these people at that time.

Q    Now, when you say "a little quantity of weed," are you talking ounce?  Pounds? What quantity of weed are you talking about?

A    Two or three kilos.

Q    Two or three kilos?

A    Right.

Q    And who was supposed to pick it up?

A    Well, there was three or four other guys that were there to pick it up.  And I could score weed from them if I could meet them there in time, which we were late that night.

Q    And what time did that usually happen?  Did that happen every night?

A    No.  It happened only once, once in a great moon.  You know, it happened mostly once out of the month, you know.

Q    But it was happening that night?

A    Yeah.  Mostly, yeah, around the 25th or 26th it happened.

Q    So you went to the mesa looking to find these

19

1   people who were going to pick up the marijuana which was

2   going to be dropped from a plane.  And what happened when

3   you got to the mesa?

4       A    Right.

5       Q    What happened when you got there?

6       A    Well, we arrived.  I seen no vehicles there.  We

7   drove around, and I didn't find -- I didn't see none of

8   the people that I dealt with there so we stopped because

9   they needed to use the rest room.  So James and --

10      Q    "James," you mean Mr. Sedillo?

11      A    Yes.

12      Q    James Sedillo and you did what?

13      A    Well, Mr. Sedillo and -- I forgot his name.

14  With an "R."  I forget his name.  They got down to

15  urinate.  And I got down and the other person that was

16  sitting behind me got down to urinate as well.

17      Q    You were just going next to the car?

18      A    Yeah, we were just standing right beside the

19  car.  I was standing there.  And all of a sudden, one of

20  the dudes turned around he grabbed me like from the

21  pockets, you know.  Like I don't know, he just spun around

22  and grabbed me and ran.  I chased after this guy.

23      Q    Why did you chase after him?

24      A    Because I thought he had taken something out of

25  my pocket.  I wasn't sure what happened.  You know, it

20

1    happened so quick.  He just broke running.  At first, I

2    thought it was my billfold he had taken out of my pocket.

3    So I chased after him.

4            Q     Did you ever catch up to him?

5            A     No.  I told him to stop, you know.  I told him,

6    "Am I going to have to shoot or something?" you know,

7    because I thought he had my billfold.

8            Q     Did you have a gun with you?

9            A     No, I didn't have no weapon on me that night.

10           Q     You just said that then to him?

11           A     Yeah, I just said because I thought he had taken

12   something out of my pocket that night.

13           Q     And then what happened?

14           A     Well, I chased after him for quite a while.  And

15   I was a little intoxicated.  So I ran pretty hard after

16   him.  I had to stop and throw up.  And when I stopped to

17   throw up, he was gone.  So I started walking back towards

18   the car and throwing up on the way back because I was out

19   of breath.  And when I got back to the car, the whole

20   different thing --

21           Q     What happened when you got back to the car?

22           A     Well, I got back to the car, and James is

23   standing there beside the car and I notice his white

24   sweater -- he's got a V-neck sweater.  It's kind of like a

25   grayish color white.  And I notice it's all reddish.

400 Gold Ave., SW • Suite 200
Albuquerque, New Mexico 87102
Tel. (505) 843-9241 • Fax: (505) 843-9242
QUALITY REPORTING AT EXCELLENT RATES!

Professional
Court
Reporters, Inc.

PAUL BACA

21

1          And I asked him, "Where did the other guy go?

2    Did he run off, too, or what?"

3          And he says -- excusing the Court -- you know,

4    excuse my language, but --

5    Q     This is what Mr. Sedillo said to you?

6    A     Mr. Sedillo told me, "I killed the fucking

7    punk."

8    Q     What did you say?

9    A     I didn't really say much.  I was like, you know,

10   it's just something I couldn't -- I couldn't believe it.

11   I asked him where he was at.  And he said he threw him

12   over there on the other side of the field right a little

13   further from where the car was parked.

14   Q     Did you ask him why he killed him?

15   A     No, I didn't ask him why.  I didn't want to know

16   why.  I just wanted to leave the area.  I don't know why

17   it happened.  I wish it would have never happened.

18   Q     But you had nothing to do with it?

19   A     I wasn't there, but yet I was accused of it.

20   Q     Now, at trial, didn't Mr. Sedillo testify that

21   you guys had planned to rob these people?

22   A     Yes, he did.

23   Q     And was that your plan?

24   A     No.  It was never my plan to rob anyone.

25   Q     And in terms of this plan that Mr. Sedillo

22

1    testified to, did you know if Mr. Sedillo took anything

2    from the other person?

3        A    I didn't know.

4        Q    Did you take anything from him?

5        A    No, sir, I didn't.

6            MR. FINZEL:    The Court's indulgence for a

7    moment, Your Honor?

8            THE COURT:    All right.

9        Q    Now, you said that you had been drinking heavily

10   and that you started to throw up after you chasing this

11   other guy.  Did you ever see what happened to this other

12   guy?

13       A    No, I didn't.

14       Q    And you never caught him?

15       A    No, I didn't.

16       Q    And you didn't take anything from him?

17       A    No, sir.

18       Q    So after Mr. Sedillo told you that he killed

19   this guy and threw him over in the field, you were saying

20   that you just wanted to get out of there, what did you do?

21       A    I just got in the car and left.

22       Q    And who left with you?

23       A    James Sedillo.

24       Q    And where did you go?

25       A    I took him home.

23

1    Q    Now, in terms of what happened that night, did

2   you explain this to your lawyer, Mr. Riggs?

3    A    No, I didn't.

4    Q    Did he ask you what happened that night?

5    A    No, he didn't.

6    Q    So in terms of your recollection about

7   testifying, Mr. Riggs advised you not to testify, but you

8   never told him what had happened that night?

9    A    Yes, sir.

10    Q    Why didn't you tell him what happened?

11    A    I didn't.  He said that we get a pretty good

12   clear case, but all the evidence was pointed at James

13   Sedillo.  It wasn't until he was arrested that he started

14   saying I killed this person.

15    Q    Now, in fact you know that in the course of the

16   trial -- and this is just by way of background, Your

17   Honor -- there was a Crime Stoppers tip.  Mr. Sedillo was

18   arrested as being the person who committed the crime, and

19   then he said you did it?

20    A    Yes, sir.

21    Q    And this came out at trial, correct?

22    A    Yes, sir.

23    Q    Now, in terms of your discussions with Mr.

24   Riggs, Mr. Sedillo testified that there was a plan for a

25   robbery, wasn't there?

24

A     Yes, he did.

Q     Did you discuss with Mr. Riggs that there was no robbery, that you weren't involved in a robbery?

A     No, I didn't.

Q     Do you remember him asking you about whether there was a robbery?

A     Yes, he did.  Yes, he did.

Q     And what did you tell him about the robbery?

A     I told him there was never, ever a robbery involved.  There was no robbery planned.  It was just something that happened that should have never happened.

Q     That's what you told Mr. Riggs?

A     Right.

Q     And he said he didn't need your testimony because they didn't have a good enough case against you, right?

A     Right.  Because if they had informants claiming that he had admitted to this murder, and that's what they had.

Q     Now, in terms of these informants that Mr. Sedillo had admitted to that he had committed the murder, do you recall whether that testimony was presented at the trial?

A     No, they denied it.  We put the motion for these informants in for my defense, and they denied it.

25

Q    That is, the judge wouldn't let --

A    Yeah.

Q    -- wouldn't require them to disclose the defendants?

MR. FINZEL:    And that's all a matter of record.

THE COURT:    Well, I can read the record. Please don't testify, Mr. Finzel, because apparently that's what you're doing.

MR. FINZEL:    Well, I didn't mean to testify, Your Honor.  I'm just laying a little foundation, Your Honor.  I'll move ahead.

THE COURT:    Okay.

Q    After the trial when you are lawyer was unable to get the testimony of the informants in, did you then have another discussion with him about the advisability of testifying at that point?

A    No, I didn't.

Q    So there was just an initial discussion before the trial, and then as things developed there was no further discussions about your testifying?

A    Right.

Q    Now, at any time did you discuss with Mr. Riggs taking a polygraph exam?

A    Yes, I did.

26

Q    And what was that discussion?

A    Well, I asked him if a polygraph would be any good, any help to me.  I knew I could pass it because I was not guilty of killing anyone.  And he told me that if I was to pass it, they would just -- I forget what word he used.

Q    What did it mean to you?

A    That the Court wouldn't use it anyhow.  The district attorney would say it was unfis -- I forget the word he told me.

Q    Not scientific?

A    No.

Q    Okay.  But what's the sense that you remember him telling you without having to worry about the word? Do you remember what the sense was about not taking a polygraph?

A    I asked him if it would help.  And he said that we can put the polygraph test, but if I was to pass the test, chances are the district attorney would say that it wasn't -- I forget that word.  I can't remember.

Q    But the sense you got was the district attorney would argue against it?  Even though you can't remember the word?

A    Right.  So instead it would not be admissible in court.  Admissible at trial or something.

27

Q    But you're not sure?

A    Yes, I am.  That's what he said.  It would not be admissible.

Q    Okay.  Now, how long before trial did you bring this up to your attorney if you recall?

A    Well, at the beginning and close to -- well, when we first started discussing the case of the murder is when I first brought this up.  And then again I brought it up right before we went to trial.

Q    Okay.  And from the very beginning, though, you discussed with your attorney whether or not you should testify; isn't that true?

A    Yes.

Q    And from the very beginning, you talked about the polygraph?

A    Yes.

Q    And from the very beginning, he told you that he advised you that you didn't need to testify?

A    Right.

Q    And if you didn't testify --, well he also told you that there would be some problem about admissibility of a polygraph?

A    Yes, he did.

Q    Okay.  Now, in terms of the course of the trial, there are some other claims that you've made about the

28

1    ineffectiveness of your lawyer?

2        A    Yes.

3        Q    One of those other claims relates to your lawyer

4    was ineffective in terms of arguments for not objecting

5    during closing argument by the prosecutor?

6        A    Yes, sir.

7        Q    And that is contained in the appeal brief that

8    was filed with the New Mexico Court of Appeals?

9        A    Yes, it was.

10       Q    Would you tell us about that, just in terms of

11   what was said in the closing argument that you found

12   objectionable?

13             MS. GANDERT:   Your Honor, I would object.

14   I don't believe he mentions that in his federal habeas

15   corpus brief.  If he does, I'm not quite sure --

16             THE COURT:   Your objection is that this

17   claim is not set forth in the 2254?  The habeas corpus?

18             MS. GANDERT:   Right.  Right.

19             THE COURT:   Mr. Finzel?

20             MR. FINZEL:   Your Honor, the claim is set

21   forth in the very broadest and most general ways, one of

22   ineffective assistance of counsel.  In terms of

23   establishing that we need to go into all the aspects of

24   the attorney's performance.  That was a claim that was

25   perfected and followed in the Court of Appeals.  It's on

29

1    the briefs.  And it was ruled on by the Court of Appeals.

2                THE COURT:    But it's not before me.

3                MR. FINZEL:    I think it is, Your Honor, in

4    terms of the general pleading of the petition alleges

5    ineffective assistance of counsel.  And then as is not

6    unusual in these situations, the particulars are somewhat

7    sketchy and also hard to go through in terms of all of the

8    different particulars.  But I think it is subsumed within

9    it.

10                And if it's not, we are allowed under Strictland

11   to bring up other matters to show the totality of

12   circumstances in support of the claims that are

13   specifically delineated.  And so it would be admissible on

14   those grounds, Your Honor, as a series.

15                THE COURT:    The objection is sustained.

16   Go on to something else.

17                MR. FINZEL:    Okay, Your Honor.

18      Q    What other claims do you recall making in your

19   petition for writ of habeas corpus with this federal court

20   other than that he did not properly preserve error in

21   closing arguments?  Against your attorney?  You've

22   mentioned the polygraph.  You've mentioned testifying.  Is

23   there anything else that you recall that you raised?

24      A    (Witness shakes head)

25      Q    What about a petition to the Supreme Court?  Did

30

1   you allege something regarding that?

2        A    Yes, I did.

3        Q    And would you tell us about that?

4        A    He never filed the petition.

5        Q    Now, isn't it true that Mr. Riggs filed your

6   docketing statement?

7             MS. GANDERT:   Your Honor, I would object

8   to that.  As I indicated in my brief for the Court,

9   objecting to this evidentiary hearing, a petition for writ

10  of certiorari under the procedure in this case was not

11  necessary for a direct appeal because in New Mexico direct

12  appeals on first degree murder cases go to the New Mexico

13  Supreme Court.  They do not go to the Court of Appeals,

14  and then to the New Mexico Supreme Court.

15            So his claim in this instance falls just through

16  New Mexico procedures.  Anyway, I think it would save the

17  Court time.

18            THE COURT:   Mr. Finzel, again you are into

19  an area that was not raised in the petition.  And I have

20  given you considerable latitude, but --

21            MR. FINZEL:   Actually that is in the

22  petition, and I believe Ms. Gandert is correct.  But that

23  is in the petition, Your Honor.

24            THE COURT:   Well, go on to something

25  else.  Sustained.

31

1          MR. FINZEL:   All right.   The Court's

2     indulgence for just a moment?

3          THE COURT:   Let me ask you while you're

4     looking, does the petition say that a polygraph was taken?

5          MR. FINZEL:   Yes, Your Honor.

6          THE COURT:   Or simply suggest it?

7          MR. FINZEL:   No.   What the petition

8     says -- and again this is hard to read, but what the

9     petition says is that subsequently Mr. Sedillo -- Mr.

10    Santillanes after his conviction did take a polygraph.

11         THE COURT:   All right.   Go ahead.

12         After his conviction?

13         MR. FINZEL:   That's correct, Your Honor.

14         THE COURT:   Go ahead.

15         MR. FINZEL:   And I will ask him that in

16    order to establish that for purposes of the evidentiary

17    hearing.

18         THE COURT:   Go ahead.

19    Q    Mr. Santillanes, you never took a polygraph

20    before your trial?

21    A    No, I didn't.

22    Q    Did you subsequently take a polygraph?

23    A    Yes, I did.

24    Q    And do you recall what were the circumstances of

25    taking it?   When did you take it?

32

1    A    I took it back in 97.

2    Q    97?

3    A    Right.

4    Q    A year ago?  Two years ago?

5    A    No, it could have been in this action.

6    Q    So within the last few years you took it?

7    A    Yes.

8    Q    And who administered that polygraph?

9    A    It was through a private investigator named --

10    Q    Let me ask you this.  Who paid for it?

11    A    My wife and myself.

12    Q    Okay.  And who made the arrangements to take it?

13    A    My wife hired the private investigator.

14    Q    Okay.  And do you remember his name?

15    A    No.

16    Q    That's okay if you don't remember.  We'll clear

17 that up in a little while.

18    A    I don't.

19    Q    Did you take the polygraph?

20    A    Yes, I did.

21    Q    And were you asked about the killing in this

22 case?

23    A    Yes, I was.

24    Q    Were you asked about the robbery in this case?

25    A    Yes, I was.

33

1    Q    And were you told about the polygraph results?

2    A    Yes, I was.

3    Q    You were told what?

4         MS. GANDERT:    Your Honor, I would object

5    to this line of questioning.  It's my understanding that

6    in federal court polygraphs are not admissible so they

7    cannot be --

8         THE COURT:    Well, overruled.  I'll go

9    ahead and listen to it.  Get to it now, though, Mr.

10   Finzel.

11        MR. FINZEL:    I'm getting to it.

12   Q    What did he tell you what happened on the

13   polygraph?  Did you pass it or not?

14   A    He said I passed it.

15   Q    And you did include that, something about that,

16   in your writ of habeas corpus, didn't you?

17   A    Yes, I did.

18   Q    And the reason you -- well, that's argument.

19        And in terms of just to finish out the record

20   with regard to the business of filing, eventually you

21   filed a writ of habeas corpus; isn't that correct?

22   A    Yes, I did.

23   Q    And the respondent has alleged that you failed

24   to file your petition for writ of certiorari on the habeas

25   corpus in a timely fashion to the New Mexico Supreme

34

1    Court?

2        A    Right.

3        Q    And we have in the file -- I believe it's in the

4    file, Your Honor -- an affidavit from Mr. Chappelle,

5    indicating that you did file it.  He helped you with it on

6    March 19th, I believe?

7        A    Yes, sir, March 19th.

8        Q    And that you and he went together and placed it

9    in the mailbox on March 19th?

10       A    Yes, we did.

11       Q    And there is also an affidavit in the file that

12   indicates that during that time there was a general lockdown.

13           MS. GANDERT:   Your Honor, I would object

14   to this line of questioning.  I believe we previously

15   covered this line of questioning.

16           THE COURT:   We've previously covered it.

17           MR. FINZEL:   It was preliminary, Your

18   Honor, just to cover it.  I'll get right to the point.

19           THE COURT:   Sustained.

20       Q    Now, you have no doubt in your mind that you put

21   that in that mailbox on March 19th; isn't that true?

22       A    Yes.

23       Q    Now, subsequently the Government has obtained

24   from the New Mexico Supreme Court a copy of the postmark

25   of the letter that you sent to them.  And you have been

35

1    provided with that, right?

2        A    Yes.

3        Q    And it shows a different postmark date, doesn't

4    it?

5        A    Yes, it does.

6        Q    Has the fact that it was postmarked at the

7    prison later than when you put it in the mailbox, has that

8    changed your opinion?  Could you be wrong about when you

9    put it in there?

10       A    No.

11       Q    And you're absolutely certain about that?

12       A    Yes, I am.

13       Q    And you have discussed it with Mr. Chappelle on

14   several occasions?

15       A    We discussed the time we mailed it.

16       Q    That's the time you mailed it, that's all?

17       A    That's all.

18       Q    You knew there was a deadline, didn't you?

19       A    Yes, I did.

20       Q    And that's why you did it when you did it?

21       A    Yes.

22       Q    Okay.  And if there is a different postmark on

23   the envelope, do you have any idea why it would have been

24   postmarked later?

25       A    No, I don't.

36

Q    Okay.  At any time -- going back to your business of Mr. Riggs and his representation of you, at any time in the course of the trial, did you tell Mr. Riggs "I want to testify"?

A    At one time, yes.

Q    And when was that?

A    The last day of the trial.  I asked him if it would be too late if I could get on the stand to testify or defend myself because no one would -- I felt that they didn't want to do a defense in my case.

Q    That what?  Excuse me?

A    I felt that they didn't want to give me a defense in my case because I was denied every motion we gave to that Court.

Q    And tell me about that conversation.

A    Well, he said we had it beat.  He said not to worry because we had a good case.  They had no evidence of any kind.  Feeling was that you had made it to actually stabbing this person and his first two statements -- first statement or the third statement, I'm not sure which statement it was.

And that he also admitted telling his little baby brother and his sister that he had killed this person and dumped them in the mesa.  And he did testify to that in trial.

400 Gold Ave., SW • Suite 200
Albuquerque, New Mexico 87102
Tel. (505) 843-9241 • Fax: (505) 843-9242
QUALITY REPORTING AT EXCELLENT RATES!

Professional
Court
Reporters, Inc.

PAUL BACA

1    Q    He said that he had done the killing, but that

2   you had helped him, right?

3    A    Yeah, he said I was there.  He was making up the

4   story we had planned to rob and kill these guys.  But

5   never showing at trial that there was never a robbery

6   involved because nothing was ever taken from either one of

7   these men.  The one person that got away testified that

8   neither one of us showed any weapons or asked for any

9   money at any time.

10         And he also claimed that we had planned to rob

11   them like for a couple weeks.  And it was proven in court

12   that these two men had just arrived in Albuquerque, New

13   Mexico.  They have never been in Albuquerque before.  They

14   were just there for that day.

15    Q    So with all of that you again asked Mr. Riggs if

16   you should testify, and he said you didn't have to?

17    A    Right, because of what was -- what was said on

18   the stand that day.

19    Q    Let me direct your attention back to before the

20   trial.  Was there ever a time when you were engaged in

21   anything that would be called a plea bargain or attempt to

22   plead this case away?

23    A    No.  They never offered me nothing.

24    Q    Well, you had some other charges pending around

25   this time, didn't you?

QUALITY REPORTING AT EXCELLENT RATES!

400 Gold Ave., SW • Suite 200
Albuquerque, New Mexico 87102
Tel. (505) 843-9241 • Fax: (505) 843-9242

Professional
Court
Reporters, Inc.

PAUL BACA

38

1      A    Yes, I did.

2      Q    Was there ever any discussion from your attorney

3  that you know of of any attempt to resolve this case and

4  another case through a plea?

5      A    No.

6      Q    Were you offered any plea in this case?

7      A    No.

8      Q    So there was no plea discussion that you're

9  aware of?

10     A    No.

11          MR. FINZEL:   I have no further questions,

12  Your Honor.

13          THE COURT:   Ms. Gandert?

14          MS. GANDERT:   Mr. Santillanes.  Your Honor?

15               CROSS-EXAMINATION

16  BY MS. GANDERT:

17     Q    Mr. Santillanes, you filed several petitions

18  for habeas corpus in state courts; isn't that correct?

19     A    Yes, ma'am.

20     Q    Okay.  Why did you never write what actually

21  happened in any of those petitions?

22     A    I really don't know.  No one wrote -- no one

23  ever told me I should write something like that.

24     Q    This is the first time then that you've told

25  your side of the story?

39

1      A     Yes.

2      Q     But this evidence is not newly discovered

3   because you knew about it all along; isn't that correct?

4      A     I knew about it all along, meaning I don't know

5   if I -- I can't -- I don't understand what you mean.

6      Q     Oh, okay.  Let me explain.  What you told the

7   Court today, what you testified to today about what

8   happened with regard to the murder of the man on the West

9   Mesa, you knew what happened since December 24th, 1984,

10   right?

11      A     Yes.

12      Q     Why did you not tell anybody about it before

13   this time?

14      A     For fear of my family.  I'm the only son.  I

15   have a mother and six sisters.  And I felt that if I was

16   to testify or become a snitch, a rat, whatever they might

17   want to call it, that harm would come to my mother and my

18   sisters.  And I couldn't see that.

19      Q     Then why are you telling us what happened now?

20   Don't you have that same fear?

21      A     No, I don't.

22      Q     Why?

23      A     Because I believe the truth should come out

24   now.  I've done so much time for a crime I didn't do.

25      Q     And you never told anyone before this that you

40

1  never did it?

2      A    Never.

3      Q    You never told your lawyer?

4      A    No, nobody.

5      Q    Do you remember in May of 1996 that you had a

6  hearing in state court?

7      A    May of 1986?

8      Q    Right.

9      A    Yes.

10      Q    You were represented by an attorney at that time

11  also, weren't you?

12      A    I believe it was Wendy York.

13      Q    Ms. York was your appellate attorney.  My

14  information in the case is that it was Sandra Clinton.  Do

15  you remember her?

16      A    Oh, Sandra Clinton was back in 96, yeah.

17      Q    Why didn't you tell her what happened so that

18  you could go through the state court testimony?

19      A    I never met Sandra Clinton until the day I was

20  in court.  We never talked.  She just went with what I had

21  filled out in the writ.  I never got to meet Ms. Clinton

22  until the day we arrived in court.  And there was like 15

23  minutes.

24          I walked in, I was denied, I walked out.  No one

25  ever gave me a chance to say my part, my side of the

41

1  story.  No one ever asked me my side of the story.

2      Q    Okay.  You didn't tell the Court, just as you're

3  telling the Court today, you had the opportunity then in a

4  trial, not withstanding your advice of counsel, to say,

5  "Your Honor, I would like to tell my side of the story."

6  But you never did that, did you?

7      A    No.  Like I said, I was there not more than 15

8  minutes.  I walked in, she introduced herself, the judge

9  walked in.  They went back and forth on some.  He denied

10  me.  I went out of the court.

11          I never had a chance to tell my part, my side of

12  the story.  No one has ever asked me for my part of the

13  story.  It has always been James' side of the story.

14      Q    Okay.  I have just a brief copy of what your

15  petition is.  Why didn't you put it in here?

16      A    Like I said, I've never told anybody my story.

17  I couldn't tell nobody because of the fact that I was in

18  prison and the people that was helping me do these

19  petitions were convicts.  I couldn't have them look at me

20  as a snitch or a rat.  I had to do it.  I had to get back

21  into court so I could tell the judge about what happened.

22              MS. GANDERT:    I have no further questions.

23              THE COURT:    All right.  Anything else, Mr.

24  Finzel?

25              MR. FINZEL:    No, Your Honor.  He answered

42

400 Gold Ave., SW • Suite 200
Albuquerque, New Mexico 87102
Tel. (505) 843-9241 • Fax: (505) 843-9242
QUALITY REPORTING AT EXCELLENT RATES!

Professional
Court
Reporters, Inc.

PAUL BACA

1    the questions I would have asked.  No further questions.

2                    THE COURT:    You can step down.

3                    THE WITNESS:    Thank you.

4                    THE COURT:    At this time I'll call Mr.

5    Joseph Riggs.

6                    THE COURT:    Step forward.  You've

7    previously been sworn.

8                         JOSEPH RIGGS III

9        (Being previously sworn, testified as follows)

10                      DIRECT EXAMINATION

11   BY MR. FINZEL:

12       Q    Mr. Riggs, would you please state your name and

13   how you got to represent Mr. Santillanes?

14       A    My name is Joseph Riggs, and I am an attorney

15   licensed to practice law in New Mexico since 1975.   In

16   1984, I had a public defender contract and I received Mr.

17   Santillanes's case through the state public defender

18   contract.

19       Q    Now, Mr. Riggs, on those state public defender

20   contracts, how much were you paid for Mr. Santillanes's

21   case?  If you recall.

22       A    It varied during the years, but it was probably

23   somewhere -- it was a set amount a month as I recall.   In

24   1984, it was approximately 2,200 a month for six cases.

25       Q    Be about $350 a case?

43

A    Something in that range.  A little bit more than that actually, but something in that range.

Q    And in those six cases a month that you would receive, you got a whole variety of cases from petty larceny to murder; isn't that true?

A    They would only be felonies.  So they would include probation violations, there was a set amount on the number of murder cases that we could get.  I can't tell you what it is, but as I recall there was a specific limit on the number of homicide cases per year.

Q    And you didn't get any extra money then to do the homicide case?

A    No.

Q    Okay.  You didn't get any extra money if you had to go to even a two-week trial on an assault case?

A    That's correct.

Q    Now, in terms of this particular case, it was ten years ago.  Do you still have any files for this case?

A    Actually it's more than like 14.

Q    14?

A    14, 15.

Q    Right.

A    No.  I normally keep my files for seven years. When I moved last summer, I probably would have purged this file previous to that.  So unfortunately I have no

44

1   file.

2       Q     In terms of your specific recollection of this

3   case, how good is it?

4       A     Not real great.   I have tried to refresh my

5   memory by reading some of the docketing statement, some of

6   the pleadings in the case, but my memory is not great.

7       Q     Well, what comes to mind about this case that

8   you do remember very clearly?

9       A     I remember the basic facts of the case.   I

10  remember my belief that Andrew was innocent.   It's one of

11  those cases that I took to trial during those years.   I

12  remember the facts and circumstances of James Sedillo, the

13  two Indians, the way the facts of the case unfolded.

14          I believe that because James Sedillo had been

15  arrested first he made his deal first.   He agreed to

16  testify against Andrew.   And I don't think he walked away

17  from it, but he certainly got a sweetheart deal.

18      Q     Now, in terms of the record that's before the

19  Court, we filed a -- you made several efforts to try and

20  get information regarding confidential informants, to

21  present various testimony that was denied before the

22  Court?

23      A     That's correct.

24      Q     In the course of your representation of Mr.

25  Santillanes, do you remember ever discussing with him a

45

1    polygraph exam?

2        A    At that time with the public defender contract

3    those issues had to be specifically requested to do.  I

4    don't have any recollection of discussing a polygraph with

5    him.  It was my policy if a client wanted a polygraph to

6    do it.  I didn't feel any restrictions on getting expert

7    witness money, and I didn't ever not get a polygraph when

8    a client requested it.  But I don't recall at all the

9    question of a polygraph coming up.

10        Q    In other words, the public defender department

11    would pay for the polygraph?  You didn't have to pay for

12    it out of your fees?

13        A    That's true.  We had to make a specific

14    request.  And especially on a murder case, during all

15    those years I don't ever remember them refusing me

16    whatever resources I needed, especially because of what we

17    were paid on the cases.

18        Q    And under that time period, under New Mexico

19    statute, there was a specific procedure which would allow

20    the admissibility of a polygraph exam if you followed the

21    procedures; isn't that correct?

22        A    Absolutely.  And I used polygraphs fairly

23    extensively at that time.  I mean, whenever a client

24    wanted a polygraph, or whenever I thought it was

25    appropriate I would raise the issue, and we would do a

46

1    polygraph.

2        Q    Well, you testified earlier that it was your

3    belief and the basis of the investigation of this case

4    that Mr. Santillanes was innocent?

5        A    That's correct.  Basically we had a case where

6    it started out with the Crime Stopper tip.  And I think

7    it's important to raise what one of my feelings about the

8    case, my memory was, that was in somewhat of the early

9    years when Crime Stoppers was new.  And I can't remember

10   when it came into effect, late 70s or early 80s.  And we

11   were testing the law.

12           And detectives talked to specific informants who

13   said that James Sedillo had committed the crime, or they

14   had been told he had committed the crime.

15           The police failed to get the names of the

16   witnesses.  I thought at the time that they had a duty to

17   acquire that evidence.  And we filed a motion seeking to

18   get that information.

19           And then filed a due process challenge to the

20   case.  I thought it was an important and significant

21   appellate issue and one that stood a reasonable chance of

22   being successful.

23           So we started the case with evidence pointing

24   the finger at James Sedillo.  James Sedillo was not a

25   credible witness in my opinion.

47

And then the other Indian that was with the
victim gave a statement and testified that he went off
with Andrew Santillanes and the victim went off with James
Sedillo out there on the mesa.  And I thought that
strongly pointed to the fact that Mr. Santillanes had not
participated, had not been the killer, had not
participated in the killing.  And I saw no evidence from
the Indian that Andrew had engaged in or participated in
the robbery.

And that, plus Mr. Sedillo's lack of
credibility, I thought, gave us a strong defense.

Q    In terms of your belief that Mr. Santillanes was
innocent, wouldn't it be extremely appropriate under those
circumstances to have him take a polygraph?

A    In retrospect, it would.  I'm not saying I
didn't discuss it or we didn't.  I mean, I don't
remember.  Certainly I think if we had done it, I would
remember it.  I don't have any recollection of discussing
it or not discussing it.  It would have been my practice
to discuss it, propose it, and do it.

Q    But in this case you can't explain --

A    I can't.

Q    -- because of the passage of time even if it
came up?

A    I can't.  I can't say that it did or it didn't.

48

Q    Well, isn't it also true that when a defense attorney during that time did a polygraph they would independently hire the polygrapher and if the results were not usable they didn't have to disclose them?

A    That's true.

Q    So there would be no harm in having him take a polygraph, would there?

A    And that was one of the reasons that I frequently used polygraphs, especially in homicide cases.

Q    So even if he failed that, you didn't have to disclose that to the Government because you didn't intend to use it?

A    True.

Q    Now, in terms of the preparation for trial, Mr. Santillanes has testified that he never explained to you what happened that night the way he has today for what he says is the first time.  Do you remember any discussion with him about what happened that night in terms of his possible testimony?

A    I remember the story as he told it here today.  And I remember discussing it.  I don't think the question of a polygraph would have been addressed, if in fact it was, without knowing his story, nor do I know how I could have advised him whether or not to testify without knowing his story.  And as he told it here this morning, that is

49

1    the way I remember him telling it to me then.

2         Q    Well, you don't have a recollection of the

3    specific discussion about a polygraph?

4         A    That's true.

5         Q    But under the circumstances as it has been

6    described today, it would certainly have been almost

7    obligatory to give him a polygraph given the information

8    that he had a different version of events and that you

9    also believed the case against him was not a good case?

10   There was nothing to lose by taking a polygraph?

11        A    The issue of his prior record -- and I can't

12   remember what it was -- would have been a strong factor in

13   the decision whether or not to testify, especially if I

14   felt like the state's case was weak and it was a

15   reasonable doubt defense or a snitch defense.

16             The informant was the one who had committed the

17   crime.  The fact that he had a prior record as I recall

18   entered into the discussions about whether or not he

19   should testify.  And I thought it would end up hurting him

20   if he did testify, especially since I wanted to try to

21   blame Sedillo for committing the crime.

22        Q    And isn't it true then if he wasn't going to

23   testify you couldn't use a polygraph anyway?

24        A    That's correct.

25        Q    Because he would have to testify for you to use

50

the polygraph?

A    He would have had to testify in order to use a polygraph, and his prior record would have come in.  And in the overall strategy of the trial, I don't think he should have testified because of his prior record.  I thought the state's case was weak because of Sedillo's background and history and because of the testimony of the other Indian, Bernally or Bernally as I recall his name was.

Q    So it is your recollection then that because of Mr. Santillanes's prior record you advised him not to testify?

A    That's correct.

Q    Do you recall if you told him that he could disregard your advice and testify anyway?

A    I recall discussing on several occasions whether or not he should testify because he said from the beginning that he was innocent, that he was with Bernally while Sedillo was with the victim.  And he said that from very early on.

But as the case unfolded, even though the Court did not require additional disclosure of the evidence relating to the Crime Stoppers tip, we felt like -- I felt like what Bernally said about being with Santillanes and the fact that Sedillo wasn't very credible and had given

51

1    as I recall some different statements, that the jury

2    should have a reasonable doubt and that Andrew ran a great

3    risk of hurting himself by testifying.

4        Because if they found out about his record then

5    that would hurt him more than the benefit gained from his

6    telling his story, which basically was consistent with

7    Bernally, basically corroborated Bernally, but also had

8    negative details about the drug issue and some of the

9    other things.

10       Q    Now, in terms of the conviction of Mr.

11   Santillanes, he was convicted of felony murder, which

12   meant there had to be a felony.  Was the only evidence

13   then the evidence of Mr. Sedillo that there had been a

14   plan to rob?

15       A    That's my recollection.

16       Q    Okay.  Now, I note through the record that you

17   fought very hard and repeatedly to try and get judge Smith

18   to disclose the informants's identity.  Right up until --

19   as I recall if I'm not mistaken right into the trial

20   itself.  And that was always denied you.  And you even

21   asked for in camera examination, which the judge denied

22   you; is that correct?  Do you recall for the record?

23       A    Yes, that was a fact -- yes, that was a large

24   basis for the appeal.

25       Q    And in fact when you were denied even what you

52

1    thought the law required by statute, that is an in camera

2    hearing where the judge would consider and ask the

3    questions privately, and you were even denied that, did

4    you think about changing your strategy in terms of having

5    Mr. Santillanes testify?

6         A     No.  Again I felt like the factor of his prior

7    record would be damaging in light of what I perceived to

8    be the witnesses of the state's case.

9         Q     Now, you've heard Mr. Santillanes testify that

10   even on the last day of the trial he had asked you if he

11   could testify.  Do you remember any of that happening?  Do

12   you have any recollection of that?

13        A     I don't.  But it's normally my practice before

14   the end of the trial to assess where we are at and make

15   some judgments based upon the evidence that has gone

16   in and review the decision whether or not to testify

17   before the end of the trial.

18             And I don't have any specific recollection of a

19   conversation with him, but it is my normal practice to

20   make a decision with my client whether or not they're

21   going to testify.

22        Q     Well, after this long passage of time, 14 years

23   as you pointed out to me, there is nothing in your

24   recollection that you recall that he didn't -- he

25   testified that he brought it up to you at the end of the

53

1   trial.  You have nothing to contradict that, do you?

2       A    Nothing to  contradict it other than my normal

3   practice of talking with a client toward the end of the

4   trial to make a decision whether or not they wanted to.

5       Q    And assuming that you of course talked to your

6   client about how things are going and assessing it, is it

7   your testimony then that your basic strategy from the

8   beginning that Mr. Santillanes's prior criminal record

9   would be so overwhelming that he shouldn't testify

10  remained your advice that you gave to Mr. Santillanes?

11      A    Correct.  I mean, it was my strategy to shift

12  the focus of the blame from my client to Sedillo.  And to

13  put on my client would have refocused the jury's interest

14  in my client.  And I wanted them to think about Sedillo

15  and test his credibility rather than testing Andrew's

16  credibility.

17      Q    And even though other times during the course of

18  your preparation you thought that the Court was going to

19  rule in your favor or that you would get some kind of an

20  opportunity for example with regard to the confidential

21  informant you thought there would at least be an in camera

22  hearing, in spite of the fact that the judge consistently

23  ruled against you on those issues you still felt the same

24  basic strategy should be followed?

25      A    I felt the same basic strategy.  And I have a

54

1    recollection that during the trial I tried to get in the

2    affidavit, or I guess it would have been an arrest

3    warrant, and get the testimony through the officers.

4        And, you know, in looking at the docketing

5    statement, I think if the judge had denied me the

6    opportunity to put that affidavit in, it would have become

7    part of the appeal.

8        So I mean, that would have been an alternative

9    strategy.  Weaker.  But I don't see it in the docketing

10   statement.  So I suppose it's possible that the judge

11   allowed the officer to testify that that was his

12   affidavit, but I don't remember that.

13   Q    That's fine.  In terms of your pretrial

14   preparation, did there come a time -- there were two

15   prosecutors in the case, weren't there?

16   A    Michael Cox and Frank Gentry.

17   Q    Now, in terms of getting ready for trial, you

18   had discussions with them about the case in terms of

19   discovery, et cetera, correct?

20   A    Certainly.

21   Q    Do you recall if there were any plea discussions

22   in the case?

23   A    I have the vaguest recollection that there were

24   plea discussions.  I don't think there has been many cases

25   over the years that I've been involved in that there

55

weren't plea discussions initiated by one side or the
other.  It is a very common fact of life.  And in a case
that appeared to be headed for trial, I can't imagine that
either I or the state wouldn't have discussed a plea.

Q     Do you recall there ever been any plea decisions
of the client, Mr. Santillanes, pleading to first degree
murder in return for some federal charges being dismissed
against him?

A     That question has been asked of me over the past
few days, and I don't have an independent recollection of
it.  But having been shown some of the documents recently,
it appears that he had a federal charge that predated this
charge by approximately a month and that there was a
resolution of that case in March of 1985, this case going
to trial in July of 1985.  So that it appears that he was
convicted of a federal charge.

Q     Before this case ever went to trial?

A     Before this case ever went to trial.  And really
before this case would have reached the point that we
would have been knowledgeable enough to discuss a joint
plea.

      I don't believe I represented him on the federal
case, although had it been offered I could have taken it
as a CJA case.  It just looks like having refreshed my
memory from some of the records, it would have been

56

premature to try to seek a joint plea.

    And since it appears that he was convicted in federal court, I don't see how I could have negotiated a plea to drop the federal charges in return for a plea to murder, or to get the murder charges dropped in return for a plea in the federal court.

    I can certainly see that it would have been discussed and at some point raised in some way; but, given the time sequence, it doesn't appear to have been any way that would have led to a probable successful conclusion of the plea negotiations.

Q   In fact, you got this case sometime in January of 1985, didn't you?  Or was it February?

A   I don't have any recollection.  It looked like the arrest was early in January.  And it was public defender practice to make a determination if there was a conflict fairly quickly and probably would have been gotten to me within a week, a week to ten days, of his arrest.  So maybe January would be a fair assumption on when I got it.

Q   So the fact that he was convict the in March of 1985 then if I heard you correctly you indicated that you would not have been in a position to really negotiate a plea prior to that time because there were so much investigation to do with this case.

57

1       A     Probably not.  It probably would have taken a

2    couple weeks to get him indicted, a couple weeks to get

3    discovery, and then we're into February.  And I just don't

4    see how the dynamics would have arisen where we could have

5    consolidated the cases.  Not consolidated, but worked to

6    arrive at a plea.

7                    MR. FINZEL:    Court's indulgence for a

8    moment, Your Honor?

9                    THE COURT:    Yes, sir.

10                   MR. FINZEL:    I have no further questions,

11   Your Honor.

12                   THE COURT:    Ms. Gandert?

13                   MS. GANDERT:    Very briefly, Your Honor.

14                        CROSS-EXAMINATION

15   BY MS. GANDERT:

16       Q     Mr. Riggs, you testified you heard the

17   testimony in this court of Mr. Santillanes?

18       A     Correct.

19       Q     And in Mr. Santillanes's testimony, he has

20   indicated that he had never told anybody this story before

21   today in this courtroom?

22       A     I heard that.

23       Q     As a defense attorney, would you advise a client

24   to testify if you didn't know what they were going to

25   testify?

58

1      A      Never.

2                 MS. GANDERT:    I don't have any further

3      questions.

4                 THE COURT:    You can step down, Mr. Riggs.

5                 THE WITNESS:    Thank you, Judge.  May I be

6      excused?

7                 THE COURT:    Yes, sir, you may.

8           Anything else from Petitioner?

9                 MR. FINZEL:    No, Your Honor.  We have no

10     further witnesses at this time.

11                THE COURT:    Ms. Gandert?

12                MS. GANDERT:    Your Honor, at this time I

13     would like to call Michael Cox, please.

14                THE COURT:    Step forward, sir.  You've

15     been sworn.

16                      MICHAEL COX

17        (Being previously sworn, testified as follows)

18                    DIRECT EXAMINATION

19     BY MS. GANDERT:

20     Q      Mr. Cox, could you please tell me your

21     profession?

22     A      I'm an attorney.

23     Q      And where do you work?

24     A      At the US Attorney's Office.

25     Q      Okay.  Where were you working in 1985?  84?

59

A     At the DA's office in the Second Judicial
District.

Q     Do you recall the case of State v. Andrew
Santillanes?

A     Yes, I do.

Q     Okay.  Could you tell me if you recall whether
there were any plea negotiations in this case?

A     There were.

Q     And could you tell me what those plea
negotiations were?

A     Mr. Riggs --

        MR. FINZEL:   Objection, Your Honor.  I
don't see the relevance of this.

        THE COURT:   Overruled.  You raised the
plea negotiation issue.  Go ahead.

A     Mr. Riggs, offered to plead his client guilty to
first degree murder in exchange for an agreement that the
time on that charge would run concurrent with time he was
facing in federal court.

Q     And why did your office decide not to accept
that plea?

A     Because as I recall, the amount of time he was
facing -- he had already been convicted and sentenced in
federal court on a rape charge -- was sufficiently high
enough -- it was either 20 or 30 years -- that he might

60

end up doing not an additional single day for the

homicide.

Because at that point in time it was still

undetermined whether a homicide was 30 years or whether

good time would apply and it would be 15.  And even if it

was 30, I believe there was a good chance that he would do

no additional time.  And therefore the plea would have

convicted him but would have had no real effect on how

much time he served.

MS. GANDERT:  I have no further questions,

Your Honor.

THE COURT:  Mr. Finzel?

CROSS-EXAMINATION

BY MR. FINZEL:

Q    Mr. Cox, I'm a little confused here.  You

testified that it's your recollection he had already been

convicted in federal court to 20 or 30 years?

A    Yes.

Q    Well, he would do most of that time?  Didn't you

know that?  In federal court?

A    I'm not sure what I knew about how much.  I knew

he would do significantly more in federal court for each

year than he would, but how much more I don't recall.

Q    And at that time you testified just now -- and

this is where I'm confused -- that if he were convicted in

61

1    state court, it wasn't clear whether he would do 15 or 30

2    years?

3        A    Right.

4        Q    Well, if he was doing 20 or 30 years in federal

5    court, in federal jail, it wouldn't make any difference

6    how much time he was doing in the state court if it was

7    run concurrent, would it?

8        A    Exactly.  That's why we refused the offer.

9        Q    But if it wouldn't make any difference in terms

10   of how much time -- I mean, did you make the offer, or did

11   Mr. Riggs make the offer?

12       A    Mr. Riggs made the offer.

13       Q    I see.  You made no offer in the case?

14       A    I don't recall if I did or not.

15       Q    So Mr. Riggs came to you and said he would plead

16   guilty to first degree murder if it ran concurrent with

17   the federal one?

18       A    Yes, he did.

19       Q    And do you remember when that was?

20       A    It was pretrial, a week, perhaps two weeks.

21   That's the best of my recollection.

22       Q    Now, you of course have heard the testimony of

23   Mr. Santillanes today that he never discussed a plea with

24   anyone.  You don't have any information to contradict

25   that, do you?

62

A      I have no idea what they discussed.

Q      Okay.  It's your testimony that was what you heard from Mr. Riggs?

A      Yes.

MR. FINZEL:    I have nothing further.

Court's indulgence for one moment, Your Honor?

THE COURT:    All right.

MR. FINZEL:    Nothing further, Your Honor.

THE COURT:    Mr. Cox, do you remember if the federal charge you described as being a rape was a rape in the Indian Country or on some other federal enclave?

THE WITNESS:    At the time, I don't know, Your Honor, but I've since seen -- recently today I saw a rap sheet that indicated Indian Country.  But I don't recall from the time what that was.

THE COURT:    Okay.  Thank you.  You can step down.

MR. FINZEL:    Court's indulgence for one moment before Mr. Cox leaves, Your Honor?

THE COURT:    All right.

MR. FINZEL:    I just wanted to look at that rap sheet.  I would like to ask a couple questions about it.

THE COURT:    Please resume your seat, sir.

63

1        And it has to do with the question I asked?

2              MR. FINZEL:    Absolutely.

3              THE COURT:    All right.

4                    FURTHER CROSS-EXAMINATION

5    BY MR. FINZEL:

6        Q    Mr. Cox, you are now an Assistant United States

7    Attorney?

8        A    Yes.

9        Q    May I show you the rap sheet?  Is this the rap

10   sheet you looked at?

11       A    Yes, I think so.

12       Q    Number 11 there?

13       A    Number 11.  I think that's the one I was looking

14   at.

15       Q    Doesn't that actually charge crime on a

16   Government reservation, not an Indian reservation?

17       A    Yes, it does.

18       Q    Then you could be incorrect, couldn't you?

19       A    I could.

20              MR. FINZEL:    Nothing further, Your

21   Honor.  Thank you.

22              THE COURT:    All right.  You can step down,

23   sir.  Thank you.  You're permanently excused from this

24   hearing.

25              Anything else from the Respondent?

64

1       MS. GANDERT:    Your Honor, at the last

2  hearing you specifically asked the Respondent to check to

3  see the types of forms that are available, given to the

4  inmates, at the penitentiary library.  And I did talk to

5  the librarian there, and he sent me a copy of them.  And I

6  didn't know if the Court wanted to make that part of the

7  record.

8       THE COURT:    Well, I do, which is why I

9  asked you to see if you could produce them.  Will there be

10  an objection to those being used?

11       MR. FINZEL:    No, Your Honor.  Those are

12  the forms.

13       THE COURT:  All right.  Why don't you have them

14  marked?  And since there is no objection, it will be

15  admitted as evidence in this hearing and may be part of

16  the record.

17       MS. GANDERT:    Okay.  Your Honor, I have

18  the original that was sent to me with copies of the

19  envelope.  I don't know if you want that one.

20       THE COURT:    The original will be fine.

21  And I will cause it to be returned at the conclusion of

22  our proceedings.

23       (Exhibit A marked)

24       THE COURT:    You've seen them, have you

25  not, Mr. Finzel?

65

MR. FINZEL:    I have seen the documents.    I
have just asked my client.    Those are the documents that
are provided at the library.    And I have a set of them
myself, Your Honor.

THE COURT:    Anything further for the
Respondent?

MS. GANDERT:    No, Your Honor.

THE COURT:    Well, let me inquire if you
want some time to brief?    Additional briefing?    Mr. Finzel?

MR. FINZEL:    Yes, Your Honor, I think that
would be appropriate under the circumstances.    There are
issues that range from procedural default all the way
through the substantive issues of the petition that the
Court is going to be ruling on.    And I would like to have
the opportunity to fully brief those for the Court in
terms of Mr. Santillanes's position.

And given the testimony today, and I think it
would fit, dovetail nicely into what we were going to try
to present to the Court on all the issues.

THE COURT:    And do you have a suggestion
how much time you might need to do this?

MR. FINZEL:    I sure -- I sure --

THE COURT:    And -- go ahead.

MR. FINZEL:    I will cause to be ordered
today a transcript of this hearing.    I imagine we can have

66

1  it in about a week.  I would ask, therefore, for 60 days

2  because I'm figuring about 45 days or 55 days to make sure

3  we brief it properly.

4          And that's not -- I have to tell the Court, I'm

5  not going to be spending 45 days on this brief, but I also

6  have to tell the Court that I have to fit this into a

7  number of other things.

8          And even though we're getting assistance on the

9  writing of briefs and other activity in terms of

10  investigators, the caseload over on my particular desk

11  right now is particularly onerous.

12          And so I have to fit  this in.  And I am going

13  to do it as quickly I can.  But it has to take to a lower

14  priority than, for example, I have an argument before the

15  Tenth Circuit Court of Appeals, but on May 14th.  That

16  does take a priority.  And I have other cases that I have

17  to do.  So we have to ask for that kind of time, but I

18  think we can do it that time.

19          THE COURT:  Ms. Gandert?

20          MS. GANDERT:  Your Honor, I just have one

21  question.  And would this briefing that we would be doing

22  also in corporate the review of the state court record and

23  trial tapes in New Mexico, or is it just on these

24  particular issues?

25          THE COURT:  The issues that are raised

400 Gold Ave., SW • Suite 200
Albuquerque, New Mexico 87102
Tel. (505) 843-9241 • Fax: (505) 843-9242

QUALITY REPORTING AT EXCELLENT RATES!

Professional
Court
Reporters, Inc.

PAUL BACA

67

1   that are before me.  And this is of course the second

2   hearing we've had on this matter.

3            MS. GANDERT:   Yes, Your Honor.  Right.

4   But in your order on this case, you indicated this hearing

5   was on the merits.

6            THE COURT:   Yes.

7            MS. GANDERT:   And if it's on the merits

8   then it would seem that it would go back to what the state

9   court actually did find in the stated court trial with

10  regard to some of these issues.

11           THE COURT:   Well, I'm not sure what I

12  understand what you're saying.  And what I'm asking you is

13  how much time do you want?  If I give Mr. Finzel 60 days,

14  including the time that it takes to get the transcript,

15  how much time do you want to respond?

16           MS. GANDERT:   Probably the regular 30 days

17  would be fine.

18           THE COURT:   All right.

19           MS. GANDERT:   Well, maybe I'll ask for 45.

20           THE COURT:   Well, I guess I'm in a good

21  mood today, and I will permit the 60 days, 45 days to

22  respond.

23            Now, there is something else that I should bring

24  up.  And perhaps it should have been looked into when this

25  case was assigned to me.  But I have some dim recollection

68

1   of a case -- it was not assigned to me at the time, but I

2   think in 1985 I was in a supervisory position in the

3   United States Attorney's Office.  And I have this

4   recollection -- as I say it's dim -- of the case involving

5   a rape case involving someone named Santillanes.

6           So I want you to investigate, both of you, if I

7   had any participation in that case insofar as the records

8   of that office might reflect it.  But I'm sure you could

9   find the Assistant US Attorney to whom it was assigned.

10  And depending on what you find, we may have to go back to

11  square one.

12          MR. FINZEL:  Your Honor, I did not realize

13  there was a rape case in 1985 until I believe it was

14  yesterday or when Ms. Gandert and I spoke.  And she only

15  became aware of it when speaking with Mr. Cox as I recall.

16          THE COURT:  My recollection is that it was

17  at the Kirtland Air Force Base.

18          MR. FINZEL:  Your recollection is correct,

19  Your Honor, that is where the charge arose from.  So we

20  will look into it and look at that issue.

21          THE COURT:  All right.  Is there anything

22  else now?

23          MS. GANDERT:  No, Your Honor.

24          THE COURT:  Okay.  We'll be in recess.

25          (Court recessed at 10:24 a.m.)

400 Gold Ave., SW • Suite 200
Albuquerque, New Mexico 87102
Tel. (505) 843-9241 • Fax: (505) 843-9242
QUALITY REPORTING AT EXCELLENT RATES!

Professional
Court
Reporters, Inc.

PAUL BACA

69

STATE OF NEW MEXICO          )

                             )    SS

COUNTY OF BERNALILLO         )

    I, DONALD A. HILLAND, CCR, Certified Court Reporter

for the State of New Mexico, hereby certify that I

reported, to the best of my ability, these proceedings,

that these pages, inclusive, are a true and correct

transcript of my stenographic notes and were reduced to

typewritten transcript through Computer-Aided

Transcription; and that on the date I reported these

proceedings, I was a New Mexico Certified Court Reporter.


    Dated at Albuquerque, New Mexico, this 7th day of

April, 1999.


                        DONALD A. HILLAND, CCR
                        New Mexico CCR No. 204
                        Expires: December 31, 1999

PAUL BACA

Professional
Court
Reporters, Inc.

400 Gold Ave., SW • Suite 200
Albuquerque, New Mexico 87102
Tel. (505) 843-9241 • Fax: (505) 843-9242
QUALITY REPORTING AT EXCELLENT RATES!